**IT IS ORDERED as set forth below:**



**Date: January 15, 2021**

_____
**Wendy L. Hagenau
U.S. Bankruptcy Court Judge**

_____

**UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| IN RE: | CASE NO. 19-54789-WLH |
| COVINGTON LODGING INC., | CHAPTER 11 |
| Debtor, | |
| COVINGTON LODGING, INC., | ADVERSARY PROCEEDING |
| Plaintiff, | NO. 19-5348-WLH |
| v. | |
| WESTERN WORLD INSURANCE GROUP, | |
| Defendant. | |

**ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

1

**THIS MATTER** is before the Court on Western World Insurance Group ("Western World")'s Motion for Summary Judgment (Doc. No. 11). This matter concerns a water leak and sewer backup, the resulting damage that occurred at a hotel owned and operated by Covington Lodging, Inc. ("Covington"), and to what extent the damage is covered by an insurance policy issued by Western World.

## *Evidentiary Issues*

Before setting out the undisputed facts in this case, the Court must consider an evidentiary issue raised by the parties. Western World has raised concerns about Todd Brownewell's ("Mr. Brownewell") deposition testimony regarding the extent of sewer backup and damage resulting therefrom at the hotel and asserts it should not be considered to the extent it is inconsistent with his prior affidavits. Western World has invoked the "sham" testimony theory.

Western World points out Mr. Brownewell has provided evidence in this matter in several ways. In a letter dated February 14, 2018 (Doc. No. 12-14), he stated he had inspected all rooms and found Category 3, grossly contaminated, water in all rooms. He provided an affidavit dated May 14, 2018 (Doc. No. 12-15) in which he again stated he observed Category 3 water in all rooms. In a second affidavit dated September 18, 2019 (Doc. No. 12-16), Mr. Brownewell stated he believed the flood damage began with Category 1 water that merged with sewer water to become Category 3 water. Finally, Mr. Brownewell was deposed on July 29, 2020 and explained that his prior notations about Category 3 water were consistent with what he observed at the scene (Doc. No. 12-27). On cross examination, Mr. Brownewell reviewed photographs taken at the Property on January 5, 2018 and stated many of the rooms showed no visible evidence of sewer damage. He noted that toilets had not been moved, and the seals had not been broken, in many of

2

the rooms on the first floor. It is this cross-examination testimony that Western World challenges as inconsistent and a "sham."

A party may not create a material issue of fact to defeat summary judgment by filing an affidavit disputing his or her own sworn testimony without demonstrating a plausible explanation for the conflict. Baer v. Chase, 392 F.3d 609, 623–24 (3d Cir. 2004). When a party does not explain the contradiction between the subsequent affidavit and the prior deposition, the alleged factual issue in dispute can be perceived as a "sham." Id. Under the "sham affidavit" doctrine, a court can disregard "an offsetting affidavit that is submitted in opposition to a motion for summary judgment when the affidavit contradicts the affiant's prior deposition testimony." Id. (citations omitted). As explained in Perma Research & Development Co. v. Singer Co., 410 F.2d 572, 577–78 (2d Cir.1969),

> If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact.

Id. at 578; see also Van T. Junkins and Assocs. v. U.S. Industries, 736 F.2d 656 (11th Cir. 1984).

A distinction must be made, however between discrepancies that create transparent shams and discrepancies that create an issue of credibility or go to the weight of the evidence. Tippens v. Celotex Corp., 805 F.2d 949, 953 (11th Cir. 1986). "The purpose of summary judgment is to separate real, genuine issues from those which are formal or pretended. To allow every failure of memory or variation in a witness's testimony to be disregarded as a sham would require far too much from lay witnesses and would deprive the trier of fact of the traditional opportunity to determine which point in time and with which words the witness . . . was stating the truth." Tippens, 805 F.2d at 953–54. Variations in a witness's testimony and failure of memory

throughout the course of discovery create an issue of credibility as to which part of the testimony should be given the greatest weight, if credited at all. Id. at 954.

Western World asks the Court to disregard Mr. Brownewell's <u>deposition</u> testimony as contradicting prior sworn statements in his affidavits. This is not a case in which a witness provided clear deposition testimony only to later make contradictory statements in a subsequent affidavit. The opposite is true here: Mr. Brownewell provided sworn affidavits before he was deposed, and Western World had ample opportunity at the deposition to examine Mr. Brownewell about both his prior sworn statements and his deposition answers.

Further, to the extent Mr. Brownewell's testimony is inconsistent, those inconsistencies are relevant to his credibility and the weight given to his testimony, but the Court cannot say his answers to the deposition questions about what he observed when looking at photographs of the Property taken on January 5, 2018 (i.e., that there was no evidence of sewer damage in many of the rooms) are directly contradictory to his prior testimony about finding Category 3 water at the Property. For these reasons, the court will consider his testimony.

*Undisputed Facts*

Covington owns and operates a 48-room, two-story motel at 10101 Alcovy Road in Covington, Georgia (the "Property").[1] The first floor of the hotel includes 24 guest rooms, an administrative office, and a narrow utility corridor called the "chase." Covington obtained an insurance policy with Western World (the "Policy") covering the Property including personal property and loss of income effective September 10, 2017 through September 10, 2018. The details of the Policy are discussed below.

---

[1] The hotel rebranded to an OYO Hotel during the course of the bankruptcy case.

Early on the morning of December 31, 2017, a sewer backup and water pipe leak occurred. The night manager at the hotel, Alan Patel, observed the incident and called Sunita Patel, the owner and manager of the hotel. Ms. Patel visited the Property and observed damage from the water and sewer events, though she was unable to determine the extent to which water and sewage had mixed.

A plumber, Bryan Mills, was called to the property and observed both a sewer backup and water pipe leak. Mr. Mills instructed Covington to turn off the hotel's water supply and to turn the supply back on when he arrived so he could attempt to identify the origin of the water pipe leak. Mr. Mills determined he could not resolve the pipe leak with the materials he had with him at the time and instructed Covington to turn off the water supply again prior to leaving. Mr. Mills observed sewage coming from a floor drain in the administrative area laundry room and used a small cable machine to clear the blockage.

Covington hired a contractor, Mr. Brownewell, to mitigate damage to the Property. Mr. Brownewell first went to the hotel on January 2, 2018 to observe the damage. Mr. Brownewell observed some sewage seepage in some of the Property, though the extent to which he observed sewage is disputed. The next day, Mr. Brownewell began efforts to mitigate damage to the Property including the removal of some guest room toilets, carpeting, and floor tiles.

Covington's agent, Allen Insurance Company, submitted an Acord Property Loss Notice by email to Western World on January 2, 2018, and Western World set up a claim for sewer backup. Western World assigned Team One Adjusting Service, LLC as an adjuster for the sewage claim. Brad Allgood, of Team One, visited the Property on January 5, 2018. Mr. Allgood observed water had been extracted and carpet and flooring and some toilets had been removed from guest rooms, though the exact number of toilets removed and whether water extraction was ongoing is disputed.

5

Mr. Brownewell sought reimbursement of $74,980.31 for his work at the Property, and Western World remitted $74,980.31 to Covington. Mr. Allgood estimated additional costs to rebuild the Property of $212,086.32. Nevertheless, Western World issued an additional payment to Covington of $25,019.69, for a total of $100,000.00 on the sewage claim. Western World valued water damage only to the Property at $6,163 and, after deducting the $2,500 deductible and $491 in deprecation, paid $3,171.76 to Covington related to the water pipe break.

Covington demanded additional payments from Western World on July 25, 2018. Covington thereafter sent another demand for $610,036.55 related to water damage independent of the sewer backup. A representative for Western World, Steven Livingston, visited the Property on September 24, 2018. Western World sent Covington a letter dated September 25, 2018 requesting an examination under oath and additional documents and information relating to the amounts claimed and repairs and contract work completed at the Property from December 1, 2017 through January 31, 2018. Covington provided an examination under oath, via Sunita Patel and Jas Singh, on January 16, 2019, at the conclusion of which Covington adopted the testimony as the company's testimony for purposes of the examination. Western World reserved its right to continue the examination and the parties stipulated Western World had 31 days in which to complete its investigation. That same day, on January 16, 2019, Covington submitted a sworn statement of proof of loss seeking $725,281.36 to repair the hotel; for furniture, fixtures, and equipment; and for lost profit due to water damage independent of the sewer backup. Western World requested additional information and documents from Covington on February 7, 2019, to which Covington responded on February 22, 2019.

The Policy provides coverage for "direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of

6

Loss." The Policy's Causes of Loss—Special Form defines the term Covered Causes of Loss and identifies certain exclusions and limitations to coverage. Section B.1.g. of the Causes of Loss—Special Form is replaced by a water exclusion (Doc. No. 12-1, p. 50), which states the Policy does not cover "loss or damage caused directly or indirectly" by "[w]ater that backs up or overflows or is otherwise discharged from a sewer, drain, sump, sump pump or related equipment." The Causes of Loss—Special Form further provides "[s]uch loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss." (Doc. No. 12-1, p. 38.)

The parties also entered into a Discharge from Sewer, Drain or Sump (Not Flood-Related Endorsement) ("Sewer Endorsement") (Doc. No. 12-1, p. 48), which provides coverage for "direct physical loss or damage to Covered Property, caused by or resulting from discharge of water or waterborne material from a sewer, drain or sump located on the described premises." It further provides, "[t]o the extent that the Water Exclusion might conflict with the coverage provided under this endorsement, the Water Exclusion does not apply to such coverage." The Sewer Endorsement states, "[t]he most we will pay under this endorsement, for the total of all covered loss and expense, is the applicable Discharge Limit Shown in the Schedule. Such limit is part of, not in addition to, the Limit of Insurance applicable to the Covered Property, business income or extra expense." The declarations set forth a $100,000.00 limit for sewer loss.

The Policy states, in the event of loss or damage, Covington has a duty to send Western World a signed, sworn proof of loss containing information for Western World to investigate the claim. It further provides Western World may examine the insured under oath about a claim, that the insured's examination answers must be signed, and that Western World would "pay for covered

7

loss or damage within 30 days after [Western World] received the sworn proof of loss[.]"  (Doc. No. 12-1, p. 21.)

On March 12, 2019, Covington filed a complaint against Western World in the Superior Court of Newton County, Georgia alleging 1) breach of contract, 2) bad faith pursuant to O.C.G.A. § 33-4-6, and 3) seeking attorney's fees pursuant to O.C.G.A. § 13-6-11.  Western World filed a notice of removal, removing the case to the United States District Court for the Northern District of Georgia on April 15, 2019.  Covington filed for Chapter 11 bankruptcy relief on March 26, 2019, and the case was stayed in the District Court pending resolution of the bankruptcy case.[2]  On November 30, 2019, the parties filed a joint motion to transfer the matter to this Court, initiating this adversary proceeding.

Western World filed the Motion on September 17, 2020 seeking summary judgment on all three counts of the complaint.  Covington responded in opposition on October 28, 2020, and Western World filed a reply in support of the Motion on November 11, 2020.  The Court held oral argument on December 14, 2020 during which counsel for Western World, Andrew Watson, and counsel for Covington, Salvatore Serio, appeared by video.  After considering argument from counsel, the Court took the matter under advisement.

### *Summary Judgment*

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law".  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56(c); Fed. R. Bankr.

---

[2] Covington was one of seven entities that filed bankruptcy on the same day and the seven cases were jointly administered (Bankr. Doc. No. 30).  Covington's First Amended Plan of Reorganization was approved on September 14, 2020 (Bankr. Doc. No. 689), and Covington's case was severed on November 20, 2020 (Doc. No. 758).

8

P. 7056(c). "The substantive law [applicable to the case] will identify which facts are material." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The party moving for summary judgment has the burden of proving there are no disputes as to any material facts. Hairston v. Gainesville Sun Pub. Co., 9 F.3d 913, 918 (11th Cir. 1993). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. The party moving for summary judgment has "the initial responsibility of informing the . . . court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits if any' which it believes demonstrate the absence of a genuine issue of material fact." United States v. Four Parcels of Real Prop., 941 F.2d 1428, 1437 (11th Cir. 1991) (citing Celotex Corp., 477 U.S. at 323). What is required of the moving party, however, varies depending on whether the moving party has the ultimate burden of proof on the issue at trial.

> When the nonmoving party has the burden of proof at trial, the moving party is not required to 'support its motion with affidavits or other similar material negating the opponent's claim' (cites omitted) in order to discharge this 'initial responsibility'. Instead, the moving party simply may 'show – that is, point out to the … court – that there is an absence of evidence to support the nonmoving party's case. (cites omitted). Alternatively, the moving party may support its motion for summary judgment with affirmative evidence demonstrating that the nonmoving party will be unable to prove its case at trial.

Four Parcels of Real Prop., 941 F.2d at 1437-38 (citing Celotex, 477 U.S. at 323-31).

Once this burden is met, the nonmoving party cannot merely rely on allegations or denials in its own pleadings. See Fed. R. Civ. P. 56(e). Rather, the nonmoving party must present specific facts that demonstrate there is a genuine dispute over material facts. Hairston, 9 F.3d at 918. When reviewing a motion for summary judgment, a court must examine the evidence in the light most favorable to the nonmoving party and all reasonable doubts and inferences should be resolved in favor of the nonmoving party. Id.

9

*Breach of Contract Claim*

The parties do not dispute that the policy is governed by Georgia law. In Georgia, the interpretation of an insurance policy is a question of law for the Court. O.C.G.A. § 13-2-1. The burden is on the insured to show the occurrence is covered. Under Georgia law, "[t]o establish a prima facie case on a claim under a policy of insurance the insured must show the occurrence was within the risk insured against." Calabro v. Liberty Mut. Fire Ins. Co., 253 Ga. App. 96, 97 (2001).

"[T]he cardinal rule of contract construction is to ascertain the intention of the parties." Garrett v. S. Health Corp. of Ellijay, Inc., 320 Ga. App. 176 (2013) (alteration in original) (quoting Bd. of Comm'rs of Crisp Cty. v. City Comm'rs of City of Cordele, 315 Ga. App. 696, 699 (2012)). "Where the terms are clear and unambiguous, and capable of only one reasonable interpretation, the court is to look to the contract alone to ascertain the parties' intent." Winders v. State Farm Fire & Cas. Co., 359 F. Supp. 3d 1274, 1277 (N.D. Ga. 2018) (citing Boardman Petroleum, Inc. v. Federated Mut. Ins. Co., 269 Ga. 326 (1998)). If the language is ambiguous, several well-worn rules come into play. "Any ambiguities in the contract are strictly construed against the insurer as drafter of the document; any exclusion from coverage sought to be invoked by the insurer is likewise strictly construed; and insurance contracts are to be read in accordance with the reasonable expectations of the insured where possible." Ga. Farm Bureau Mut. Ins. Co. v. Gaster, 248 Ga. App. 198, 198-99 (2001) (citations omitted in original) (quoting Richards v. Hanover Ins. Co., 250 Ga. 613, 615(1) (1983)).

In Georgia, an insurer may fix the terms of its policy as it wishes, insuring against certain risks and excluding others, provided the terms are not contrary to law. "Where an insurer grants coverage to an insured, any exclusions from that coverage must be defined clearly and distinctly." Hurst v. Grange Mut. Cas. Co., 266 Ga. 712, 716 (1996). "[T]he burden is on the insurer to show

10

that a loss or claim comes within an exception to coverage." Crawford v. Lawyers Title Ins. Corp., 296 Ga. App. 459, 460 (2009) (citations omitted). As explained by the Georgia Court of Appeals, "[e]xclusions to [an insurance policy] require a narrow construction on the theory that the insurer, having affirmatively expressed coverage through broad promises, assumes a duty to define any limitations on that coverage in clear and explicit terms." W. Pac. Mut. Ins. Co. v. Davies, 267 Ga. App. 675, 680 (2004) (citations omitted).

When multiple events occur simultaneously causing inseparable damage, some of which events may be covered and others not, the terms of the policy govern the coverage. If no policy provisions govern the situation, courts look to the doctrine of efficient proximate cause to determine if the damage is covered or excluded. See Burgess v. Allstate Ins. Co., 334 F. Supp. 2d 1351, 1359–60 (N.D. Ga. 2003) (explaining Georgia has adopted the efficient proximate cause doctrine and it is well-grounded in Georgia jurisprudence).

> The doctrine of efficient proximate cause governs situations where a risk specifically insured against sets other causes in motion in an unbroken sequence between the insured risk and the ultimate loss. In such situations, the insured risk is regarded as the proximate cause of the entire loss, even if the last step in the chain of causation was an excepted risk.

Id. at 1360 (citations omitted). When an insured can identify an insured peril as the proximate cause, then there is coverage even if subsequent events are specifically excluded from coverage. See id.

When damage arises from multiple causes, parties can contract around these default rules with an anticoncurrent cause clause ("ACC"). ACC's entirely bar insurance coverage where a property loss is caused by a combination of covered and excluded perils. See generally Dale Joseph Gilsinger, *Validity, Construction, and Application of Anticoncurrent Causation (ACC) Clauses in Insurance Policies*, 37 A.L.R.6th 657 (2008 & Supp. 2014). An ACC in an insurance

11

policy is designed to circumvent the doctrine of efficient proximate cause. Boazova v. Safety Ins. Co., 462 Mass. 346, 357 n.4 (2012). The district court in Ken Johnson Properties, LLC v. Harleysville Worcester Summary Ins. Co., 2013 WL 5487444 (D. Minn. Sept. 30, 2013), explained the interplay of these concepts:

> Under the concurrent causation doctrine, where an excluded peril contributes to a loss, an insured may recover only if a covered peril is the efficient and proximate cause of the loss. Conversely, if an excluded peril is the efficient and proximate cause of the loss, then coverage is excluded. The efficient proximate cause of a loss is the fundamental cause, or the cause that set the chain of events into motion. Insurance companies use anti-concurrent causation clauses . . . in order to exclude coverage when any portion of the loss was caused by an excluded event. When an anti-concurrent loss provision is triggered, therefore, courts need not inquire into which of a covered or excluded loss was the proximate cause of the damage, but simply exclude coverage where any portion of the loss was caused or contributed to by an excluded loss.

Id. at *12 (citations and parentheticals omitted).

An ACC does not apply, however, if two or more forces cause different, distinct, divisible damage. If two perils cause two different losses, the forces are not working concurrently but separately and, therefore, the ACC is not implicated. 5 *New Appleman on Insurance Law Library Edition* § 44.04. The damage would be treated separately, and the ACC would not prevent coverage of the covered item. For example, as one treatise explains, "[i]f wind (not excluded) causes one type of damage and flood (excluded) causes another type of damage, then the wind-caused damage is covered and the flood-caused damage is not. The anti-concurrent cause provision is irrelevant." See id.; see also Leonard v. Nationwide Mut. Ins. Co., 499 F.3d 419, 430 (5th Cir. 2007) (defining discrete categories of damage and noting if wind and water "synergistically" caused the same damage, the applicable anticoncurrent cause clause would exclude such damage from coverage).

12

Western World contends it has paid all that is required under the policy. It contends that, with one exception, all the damage to the property was caused by a combination of clear water from a broken water pipe and sewer back up from the sewer drain. It contends that the damage caused by these two perils cannot be separated and thus the ACC prohibits payment. While Western World acknowledges the Sewer Endorsement, it points out the Sewer Endorsement is limited to $100,000 and contends any damage in excess of that amount is barred by the ACC, whether it be damage to the building, to personal property, or to business income. Western World's argument raises both factual and legal issues. The factual issue is whether the damage caused by the water and sewer leaks was inseparable. The legal issue only arises if, factually, the damage cannot be separately attributed to the water or sewer leaks. In that instance, the legal question is how to read the policy, water exclusion, and Sewer Endorsement together.

Covington contends the damage from the sewer and the damage from the water is separate. It points to the location of the sewer drain in the laundry room, the location of the water line break in the center of the chase hallway, and evidence that only two of the guest room toilets were removed immediately after the damage in support of its argument. It contends the water only damage is $725,281.36. Western World, on the other hand, argues the water only damage occurred from a pipe leak in the chase and totaled at $6,163.00 for which it has already paid. It relies on Mr. Brownewell's testimony that he found category 3 water in all the rooms, service area, and office to conclude the water and sewer combined to cause the damage.

Construing the facts in the light most favorable to the nonmovant as the Court must, the Court finds there are genuine issues of material fact that preclude judgment as a matter of law. The Policy includes an ACC, but the provision only applies when two perils work together to cause the same damage. There are genuine issues of material fact about whether the two separate

13

events—the water pipe leak and the sewer backup—resulted in separate damage or whether they simultaneously contributed to the damage.

Because an issue of fact remains as to whether all or a portion of the damage can be separately attributed to water or sewer, the Court need not decide the legal question raised by Western World today. The Court recognizes that cases are split about how an endorsement providing limited coverage should be read together with an ACC and whether the ACC would bar recovery for damage above the endorsement's recovery limit. Compare Ken Johnson Properties, LLC, 2013 WL 5487444 (finding endorsement removed exclusion for damage caused by water backing up or overflowing through a drain and did not reinsert the exclusion into the policy, even after the $25,000 cap on coverage had been reached), with Troutman v. QBE Ins. Corp., 2018 WL 2741060 (W.D.N.C. June 6, 2018) (finding argument that definitions in the limited endorsement superseded those of the original policy unavailing). The Court will address the issue if it becomes necessary after the facts are developed at trial. For the reasons stated above, the Court finds there are genuine issues of material fact and summary judgment is not appropriate on Covington's breach of contract claim.

### *Bad Faith Claim*

Georgia law O.C.G.A. § 33-4-6 provides a remedy for bad faith denial of insurance benefits. It states, in pertinent part,

> In the event of a loss which is covered by a policy of insurance and the refusal of the insurer to pay the same within 60 days after a demand has been made by the holder of the policy and a finding has been made that such refusal was in bad faith, the insurer shall be liable to pay such holder, in addition to the loss, not more than 50 percent of the liability of the insurer for the loss or $5,000.00, whichever is greater, and all reasonable attorney's fees for the prosecution of the action against the insurer.

O.C.G.A. § 33-4-6(a). "The purpose of the section is to penalize insurers that delay payments without good cause. As the section imposes a penalty, it is strictly construed; consequently, a

14

proper demand for payment is essential to recovery. In this sense, a demand for payment must be made when immediate payment is in order." Howell v. S. Heritage Ins. Co., 214 Ga. App. 536, 536 (1994) (citations omitted).

"It is well settled that, in order to assert a claim under O.C.G.A. § 33-4-6, a demand for payment must be made at least 60 days before suit is filed." Cagle v. State Farm Fire & Cas. Co., 236 Ga. App. 726, 727 (1999) (quoting Guarantee Reserve Life Ins. Co. v. Norris, 219 Ga. 573, 575 (1964) ("[A] failure to wait at least 60 days between making demand and filing suit constitutes an absolute bar to recovery of a bad-faith penalty and attorney fees under this statute.")). "'It has long been the law that in order to serve as a bad faith demand, the demand must be made at a time when immediate payment is due.' The demand 'is not in order if the insurer has additional time left under the terms of the insurance policy in which to investigate or adjust the loss and therefore has no legal duty to pay at the time the demand is made.'" Lavoi Corp. v. Nat'l Fire Ins. of Hartford, 293 Ga. App. 142, 146 (2008). When the prerequisites of the policy are not satisfied, no payment is due and no bad faith penalties can arise by virtue of O.C.G.A. § 33-4-6. See Primerica Life Ins. Co. v. Humfleet, 217 Ga. App. 770, 772 (1995). In such cases, summary judgment in the insurer's favor for bad faith damages is appropriate. See id.; see also Lavoi Corp., 293 Ga. App. at 146.

Western World asserts that 60 days did not elapse from the date it received a proper demand and the date Covington filed suit. Pursuant to the Policy, Covington had a duty to send Western World a signed, sworn proof of loss containing information for Western World to investigate the claim and Western World would "pay for covered loss or damage within 30 days after [Western World] received the sworn proof of loss[.]" While Covington sent Western World requests for payment prior to 2019, Western World had yet to receive formal evidence of Covington's losses

15

as required under the Policy and no payment was due.  Covington completed an examination under oath and submitted a sworn statement in proof of loss on January 16, 2019.  Western World then had 30 days to investigate or adjust the loss.  Accordingly, immediate payment was not due until February 15, 2019.  Less than 60 days after submitting its sworn proof of loss form, and less than 60 days after immediate payment was due under the Policy, Covington filed suit against Western World on March 12, 2019.  Covington's failure to wait 60 days before filing suit bars recovery as a matter of law under O.C.G.A. § 33-4-6.

But even assuming the demand was timely, Covington cannot prevail under O.C.G.A. § 33-4-6 because the evidence filed in support of Western World's motion for summary judgment is sufficient to demonstrate that Western World had reasonable grounds to contest Covington's claims.  "Bad faith means any frivolous and unfounded purpose in law or in fact in refusing to undertake a contractually promised defense assistance."  Am. Family Life Assurance Co. v. U.S. Fire Co., 885 F.2d 826, 833-34 (11th Cir. 1989) (citing Hilde v. U.S. Fire Ins. Co., 184 Ga. App. 611, 613 (1987)).  The insured bears the burden of proving that the refusal to pay the claim was made in bad faith.  Allstate Ins. Co. v. Smith, 266 Ga. App. 411, 413 (2004).  "Penalties for bad faith are not authorized where the insurance company has any reasonable ground to contest the claim and where there is a disputed question of fact."  Id. (citations omitted).  Where there are factual issues regarding the merits of a claim, an insurance company has reasonable grounds to contest a particular claim, even if it ultimately is obligated to pay under the terms of the policy for the loss.  See id.  If no evidence of bad faith is presented, the insurer is entitled to judgment as a matter of law on a claim for damages under O.C.G.A. § 33–4–6.  See King v. Atlanta Cas. Ins. Co., 279 Ga. App. 554, 556–557 (2006) (citing Ga. Farm Bureau Mut. Ins. Co. v. Williams, 266 Ga. App. 540, 542 (2004)).

Western World did not settle Covington's claims because it believed the damage was not covered. Western World has pointed to evidence that supports its version of events, and the Court has found there is a genuine issue of material fact about what exactly transpired and whether the resulting damage was covered. Moreover, the Court has cited to conflicting legal authority on the construction of ACCs and endorsements such as in the Policy. The undisputed evidence presented is sufficient to demonstrate as a matter of law Western World had reasonable grounds to contest Covington's claims and, even if it does not ultimately prevail at trial, Western World has demonstrated it did not refuse payment on the policy for "frivolous" or "unfounded" reasons. Accordingly, summary judgment is warranted in favor of Western World on Covington's bad faith claim under O.C.G.A. § 33-4-6.

### *Attorney's Fees*

Covington seeks attorney's fees pursuant to O.C.G.A. § 13-6-11. O.C.G.A. § 13-6-11 is a general provision that provides for attorney's fees in certain circumstances. Georgia law is clear, however, that O.C.G.A. § 33-4-6 provides the exclusive means to recover attorney fees for an insurer's bad faith refusal to pay insurance proceeds. The Georgia Court of Appeals has expressly stated: "O.C.G.A. § 33–4–6 is the exclusive remedy for bad faith denial of benefits so that litigation expenses under O.C.G.A. § 13–6–11 are not recoverable." U.S.A.A. v. Carroll, 226 Ga. App. 144, 148 (1997); see also Johnston v. Companion Property & Cas. Ins. Co., 318 Fed. Appx. 861, 868 (11th Cir. 2009) ("Georgia courts have explicitly stated that in cases where a plaintiff alleges that an insurer engaged in bad faith by refusing to pay a claim, an action 'for attorney fees and expenses of litigation under O.C.G.A. § 13–6–11 is not authorized.'").

Covington is precluded under Georgia law from availing itself of O.C.G.A. § 13–6–11 because the penalties contained in O.C.G.A. § 33–4–6 are the exclusive remedies for an insurer's

17

bad faith refusal to pay insurance proceeds. Accordingly, Western World is entitled to judgment as a matter of law on Covington's claim for attorney's fees under O.C.G.A. § 13–6–11.

## *Conclusion*

For the reasons stated above, the Motion is **GRANTED IN PART** and **DENIED IN PART.** Summary judgment is **GRANTED** in favor of Western World on Covington's claims for bad faith pursuant to O.C.G.A. § 33–4–6 and attorney's fees under O.C.G.A. § 13–6–11. Western World's request for summary judgment is **DENIED** as to Covington's breach of contract claim.

## END OF ORDER

**Distribution List**

Salvatore J. Serio
Serio Law, Inc.
1302 Milstead Avenue
Conyers, GA 30312

Edward F. Danowitz
Danowitz Legal, P.C.
300 Galleria Parkway, SE
Suite 960
Atlanta, GA 30339-5949

Lewis Andrew Watson
Butler Weihmuller Katz Craig, LLP
Suite 150
11605 N. Community House Road
Charlotte, NC 28277

Covington Lodging Inc.
Attn: Sunita Patel
1659 Centennial Olympic Pkwy. NE
Conyers, GA 30013-6547