

**IT IS ORDERED as set forth below:**

**Date: September 15, 2021**

_____
**Wendy L. Hagenau**
**U.S. Bankruptcy Court Judge**

_____

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| IN RE: | ) | CASE NO. 19-54789-WLH |
| | ) | |
| COVINGTON LODGING INC., | ) | CHAPTER 11 |
| | ) | |
| Debtor. | ) | JUDGE WENDY L. HAGENAU |
| ―――――――――――――― | ) | |
| | ) | |
| COVINGTON LODGING, INC., | ) | |
| d/b/a America's Best Value Inn, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | ADV. PROC. NO. 19-5348-WLH |
| | ) | |
| WESTERN WORLD INSURANCE | ) | |
| GROUP, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| ―――――――――――――― | ) | |

**FINDINGS OF FACT, CONCLUSIONS OF LAW,**
**AND DECISION OF THE COURT AFTER TRIAL**

1

This breach of insurance contract case requires the Court to consider complex legal and factual questions regarding damage to the property of Debtor Covington Lodging, Inc. ("Covington") from an event involving a water pipe break and sewer drain backup.

The Court has jurisdiction to hear this matter under 11 U.S.C. § 1334(b) as the case is a claim of Covington and is related to Covington's bankruptcy case pending in this Court.  This matter was referred to the Bankruptcy Court pursuant to 28 U.S.C. § 157(a).  Although this case is not a core matter under 28 U.S.C. § 157(b)(2), the parties have agreed the Court has jurisdiction to hear this case and authority to make a final adjudication.  In their Motion to Transfer the Case from the U.S. District Court in the Northern District of Georgia ("District Court") to this Court, they stipulated "that the Bankruptcy Court has concurrent jurisdiction and is an appropriate forum for the final adjudication of the issues contained within the case in the form of an adversarial hearing."  (Doc. No. 1 p. 17.)  The parties also represented in the Pretrial Order that no questions existed regarding the Court's jurisdiction.  Because the parties have expressly and implicitly consented to the Court's final adjudication of this matter, the Court's exercise of such authority is appropriate.  See Wellness Int'l Network Ltd. v. Sharif, 135 S.Ct. 1932 (2015): Howell v. Fulford (In re S. Home & Ranch Supply Inc.), 561 B.R. 810, 812 n.1 (Bankr. N.D. Ga. 2016).

## FACTS

When Covington filed its bankruptcy petition on March 26, 2019, it had a case pending against Western World Insurance Group Inc. ("WW") in the Newton County Superior Court in which it asserted three claims: 1) breach of contract (Covington alleged WW failed to pay for damage incurred as a result of an event involving a water pipe break and a sewer drain backup), 2) bad faith, and 3) attorney's fees.  WW then filed a notice of removal of the case to the District Court on or about April 15, 2019.  Subsequently, the parties filed a joint motion in the District

Court to transfer the case to this Bankruptcy Court.  On December 5, 2019, the District Court transferred this case to the Bankruptcy Court.

After the completion of discovery, WW filed a motion for summary judgment, which the Court granted in part and denied in part.  (Doc. No. 33.)  It granted summary judgment to WW on Covington's claim for bad faith and attorney's fees.  It denied WW's motion for summary judgment as to the primary claim of Covington for breach of contract.  In particular, the Court stated a factual issue existed as to whether the damage to Covington's property could be separated between damage caused by the water pipe break and damage caused by the sewer drain backup. The Court deferred a decision on the legal issue as to how the Policy applied if the damage could not be separated.

The Court held a trial in person from July 20-23, 2021, at which it heard the testimony of numerous witnesses and received multiple exhibits into evidence.  Additionally, both parties tendered the deposition of Todd Brownewell, including exhibits thereto, to the Court for testimony since Mr. Brownewell did not respond to subpoenas by either party.  Finally, WW submitted a list of specified excerpts of the Fed. R. Civ. P. 30(b)(6) deposition taken of Covington to be admitted as substantive evidence.

The parties agreed in the Pretrial Order that the undisputed facts found by the Court in its order on the motion for summary judgment were stipulated.  For ease of reference, they are restated here.

***Undisputed Facts***

Covington owns and operates a 52-room[1], two-story motel at 10101 Alcovy Road in Covington, Georgia (the "Property"). The first floor of the motel includes 24 guest rooms, an administrative office, and a narrow utility corridor called the "chase." Covington obtained an insurance policy with WW (the "Policy") covering the Property, including personal property and loss of income, effective September 10, 2017 through September 10, 2018. The details of the Policy are discussed below.

Early on the morning of December 31, 2017, a sewer drain backup and water pipe break occurred. The night manager at the motel, Alan Patel, observed the incident and called Sunita Patel, the owner and manager of the motel. Ms. Patel visited the Property and observed damage from the water pipe and sewer drain events, though she was unable to determine the extent to which water from the pipe and drain had mixed.

A plumber, Bryan Mills, was called to the Property. Mr. Mills instructed Covington to turn off the motel's water supply and to turn the supply back on when he arrived so he could attempt to identify the origin of the water. When he arrived, he observed both a sewer drain backup and water pipe break. Mr. Mills determined he could not resolve the water pipe break with the materials he had with him at the time and instructed Covington to turn off the water supply again prior to leaving. Mr. Mills observed water coming from a floor drain in the administrative area laundry room and used a small cable machine to clear the blockage.

Covington hired a contractor, Todd Brownewell, to mitigate damage to the Property. Mr. Brownewell first went to the motel on January 2, 2018 to observe the damage. Mr. Brownewell

---

[1] The statement of facts submitted in connection with the Motion for Summary Judgment stated the motel had 48 rooms, but evidence at trial showed it has 52 rooms.

observed some sewage seepage in some of the Property. The next day, Mr. Brownewell began efforts to mitigate damage to the Property including the removal of some guest room toilets, carpeting, and floor tiles.

Covington's agent, Allen Insurance Company, submitted an Acord Property Loss Notice by email to WW on January 2, 2018, and WW set up a claim for sewer backup. WW assigned Team One Adjusting Service, LLC as an adjuster for the sewage claim. Brad Allgood, of Team One, visited the Property on January 5, 2018. Mr. Allgood observed water had been extracted and carpet, flooring, and some toilets had been removed from guest rooms.

Mr. Brownewell sought reimbursement of $74,980.31 for his work at the Property, and WW remitted $74,980.31 to Covington. Mr. Allgood estimated costs to rebuild the Property of $212,086.32. Nevertheless, WW issued an additional payment to Covington of only $25,019.69, for a total of $100,000.00 on the sewage claim. WW valued water damage only to the Property at $6,163 and, after deducting the $2,500 deductible and $491 in deprecation, paid $3,171.76 to Covington related to the water pipe break.

Covington demanded additional payments from WW on July 25, 2018. Covington thereafter sent another demand for $610,036.55 related to water damage independent of the sewer drain backup. On January 16, 2019, Covington submitted a sworn statement of proof of loss seeking $725,281.36 to repair the motel; for furniture, fixtures, and equipment; and for lost profit due to water damage independent of the sewer drain backup.

***Insurance Policy***

a.  Loss

The Policy is an "all risk" commercial property policy.  It provides, "We will pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations

5

caused by/resulting from any Covered Cause of Loss." Covered Property includes the Property and the Business Personal Property ("BPP"). With respect to "Covered Causes of Loss," the Policy states, "See Applicable Causes of Loss Form as shown in the Declarations." In the Declarations, the Causes of Loss Form is identified as "special." The Causes of Loss – Special Form states:

> **A.** Covered Cause of Loss.
> When Special is shown in the Declarations, Covered Causes of Loss means Risks Of Direct Physical Loss unless the loss is:
> **1.** Excluded in Section **B.**, Exclusions; or
> **2.** Limited in Section **C.**, Limitations:
> **B.** Exclusions.
> **1.** We will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.

One of the exclusions identified in Part B is found at B.1.g. and labeled "Water." Covington's policy, however, had a special endorsement entitled "Water Exclusion." This endorsement states specifically that it modifies the insurance provided under "Causes of Losses – Special Form." It provides as follows:

> **A.** The following replaces Exclusion **B.1. g. Water** under the CAUSES OF LOSS FORMS and the STANDARD PROPERTY POLICY:
> **G.** Water
> **(1)** Flood, surface water, waves (including tidal wave and tsunami), tides, tidal water, overflow of any body of water or spray from any of these, all whether or not driven by wind (including storm surge);
> **(2)** Mudslide or mudflow;
> **(3)** Water that backs up or overflows or is otherwise discharged from a sewer, drain sump, sump pump or related equipment;
> **(4)** Water under the ground surface pressing on, or flowing or seeping through:
> **(a)** Foundations, walls, floors or paved surfaces;
> **(b)** Basements, whether paved or not; or
> **(c)** Doors, windows or other openings; or
> **(5)** Waterborne material carried or otherwise moved by any of the water referred to in Paragraph **(1)**, **(3)** or **(4)**, or material carried or otherwise moved by mudslide or mudflow.

6

b.  Sewer Endorsement

Covington then purchased an endorsement entitled "Discharge from Sewer, Drain or Sump (Not Flood-Related)" ("Sewer Endorsement").  It provides, "This endorsement modifies insurance provided under the following:

Building and Personal Property Coverage Form

Business Income (and Extra Expense) Coverage Form".

The Sewer Endorsement is blank as to the liability limit for property damage and business income losses.  Instead, it provides, "Information required to complete this Schedule, if not shown above, will be shown in the Declarations."  The limit of insurance in the Declarations for discharge from sewer, drain or sump is $100,000. The Sewer Endorsement provides

> **A.** If a Discharge Limit for Property Damage is entered in the Schedule, the following applies:
> With respect to the premises identified in the Schedule, we will pay for direct physical loss or damage to Covered Property, caused by or resulting from discharge of water or waterborne material from a sewer, drain or sump located on the described premises, provided such discharge is not induced by flood or flood-related conditions.
> …
> **B.** If a Discharge Limit for Business Interruption is entered in the Schedule, the following applies:
> With respect to the premises identified in the Schedule, we will pay for business income loss and/or extra expense in accordance with the terms of the Coverage Form applicable to such premises under your policy, when such loss or expense arises out of the direct physical loss or damage described in Paragraph **A.**
> …
> **C.** To the extent that the Water Exclusion might conflict with the coverage provided under this endorsement, the Water Exclusion does not apply to such coverage.
> …
> **F.** The most we will pay under this endorsement, for the total of all covered loss and expense, is the applicable Discharge Limit shown in the Schedule. Such Limit is part of, not in addition to, the Limit of Insurance applicable to the Covered Property, business income or extra expense.
> …

7

**H.** All policy provisions apply to the coverage provided under this endorsement unless otherwise indicated, including the Deductible for direct physical loss or damage and the "period of restoration" for business income and extra expense.

<u>c.  Valuation of loss</u>

In the event of a loss, among the many provisions in the Policy is the following.

**7.**  Valuation.  We will determine the value of covered property in the event of loss or damages as follows:
    **a.** At actual cash value as of the time of loss or damage …

However, Covington purchased optional replacement cost coverage, so the following applies:

Replacement Cost (without deduction for depreciation) replaces Actual Cash Value in the Valuation Loss Condition of this Coverage Form.
…
**(a)** You may make a claim for loss or damage covered by this insurance on an actual cash value basis instead of a replacement cost basis.  In the event you elect to have loss or damage settled on an actual cash value basis, you may still make a claim for the additional coverage this Optional Coverage provides if you notify us of your intent to do so within 180 days after the loss or damage.
**(b)** We will not pay on a replacement cost basis for any loss or damage:
    **(1)** Until the lost or damaged property is actually repaired or replaced;
    **(2)** Unless the repairs or replacement are made as soon as reasonably possible after the loss or damage.

<u>d. Business Income</u>

In addition to commercial property coverage, Covington purchased "Business Income (and Extra Expense)" coverage.  This coverage relies upon the same Causes of Loss form as the commercial property coverage, i.e., the Special Causes of Loss Form.  The Policy provides:

We will pay for the actual loss of Business Income you sustain due to the necessary "suspension" of your "operations" during the "period of restoration."  The "suspension" must be caused by direct physical loss of or damage to property at premises which are described in the Declarations and for which a Business Income Limit of Insurance is shown in the Declarations.  A loss or damage must be caused by or result from a Covered Cause of Loss. … We will pay Extra Expense (other than the expense to repair or replace property) to:
(1) Avoid or minimize the "suspension" of business and to continue operations at the described premises or at replacement premises or temporary locations,

8

including relocation expenses and costs to equip and operate the replacement location or temporary location.

(2)    Minimize the "suspension" of business if you cannot continue "operations".

The Policy contains detailed definitions of Business Income and Extra Expense.  The Policy defines "period of restoration" as:

the period of time that:

**a.**  Begins

**(1)** 72 hours after the time of direct physical loss or damage for Business Income coverage;

…

**b.**  ends on the earlier of

**(1)** The date when the property at the described premises should be repaired, rebuilt or replaced with reasonable speed and similar quality; or

**(2)** The date when business is resumed at a new permanent location.

e.  Two or more coverages

Another portion of the Policy is entitled Commercial Property Conditions.  Contained within that is the following:

**C.**  Insurance under Two or More Coverages.  If two or more of this policy's coverages apply to the same loss or damage we will not pay more than the actual amount of the loss or damage.

f.  Declarations

Finally, the declarations page shows that the limit of insurance for discharge from sewer, drain, or sump is $100,000, the limit of insurance for BPP is $300,000, the limit of insurance for business income (and extra expense) is $445,000, and the limit of insurance on the building is $1,900,000.

***Findings of Additional Facts After Trial***

While the foregoing facts were undisputed by the parties, numerous facts were disputed and the parties presented evidence on them.  To determine these disputed facts, the Court looked to whether each party met its burden of proof.  The parties agree that the insured (Covington) has

the burden of establishing the damage was covered by the insurance policy, and that the insurer (WW) has the burden of proving the damage was excluded or limited.  See Calabro v Liberty Mut. Fire Ins. Co., 253 Ga. App. 96 (2001); Crawford v. Lawyers Title Ins. Corp., 296 Ga. App. 459 (2009).  The burden in each case is the preponderance of the evidence.  U.S. Fire Ins. Co. v. Tuck, 115 Ga. App. 562, 570 (1967); Gulf Life Ins. Co. v. Moore, 82 Ga. App. 136 (1950). Relevant in this case is the agreement of the parties, consistent with the law, that WW has the burden of proving that the damage to Covington's property was caused at least in part by the sewer drain backup and the damage could not be separated between damage caused by the water pipe break and damage caused by the sewer drain backup.  With this background, the Court makes the following findings of fact.

In order to understand the positions of the parties, the layout of the building is important. The lower floor of the building consists of 24 motel rooms.  Each room opens to a parking lot and each room backs up to a service hallway, which the parties refer to as the "chase".  In each room, the door opens into the bedroom, and the bathroom is in the back of the room, next to the chase. The rooms numbered 111 – 122 face the parking lot with the entrance to the motel.  Rooms 123 – 134 face the parking lot on the "back" side of the building.  The rooms on the backside are "single" rooms containing a single king-sized bed, while the rooms on the driveway side of the building are double rooms containing two queen-sized beds.  Two rooms (113 and 114) are accessible rooms.  Rooms 111 and 134 are opposite each other, with the chase in the center.  At the end by these two rooms is a small, covered breezeway where ice machines and soda machines are kept. From the breezeway one may walk into an adjoining building containing the laundry room.  Behind the laundry room is the entryway in which guests would register for a stay, an office, and a small apartment area where the manager of the motel lived (containing a kitchen, living room and

10

bedroom) (collectively, the adjoining building is referred to as the "administration building"). When walking from the area of the building with the rooms to the laundry room, one steps down several inches into the laundry room. Although the parties sometimes referred to this as two buildings, it in fact is one building with one roof as the second-floor rooms extend over both. Finally, there is only one "hub" drain in the entire building, and it is located in the laundry room.

When the manager of the motel, Alan Patel, awoke early on the morning of December 31, 2017, he called Bryan Mills, a plumber with 13 plus years of experience, to report a water leak. Mr. Patel was frantic in his conversation with Mr. Mills. Mr. Mills told him to turn off the water and explained to him how to find the water turnoff. This initial phone was received by Mr. Mills between 6:00 and 8:00 a.m. Mr. Mills immediately made his way to the motel, arriving 20 to 30 minutes later. As he pulled into the driveway, he drove through water and observed water everywhere. He observed water going over the curb from Rooms 111-122. He parked in front of Room 111 and met Mr. Patel at the breezeway at the entrance to the chase. At that spot, he was standing in 3-4 inches of water. When Mr. Mills entered the chase, he again saw water everywhere with 3 inches or more on the floor. When the water was turned back on, he observed one or more breaks in the water distribution pipe located in the chase between Rooms 112 and 113 and Rooms 133 and 132 (which are directly across from each other) ("water pipe break"). Water from the distribution pipe was spraying in multiple directions as high as 8 feet. The water was hitting the drywall in the chase. Mr. Mills also observed water pouring into the laundry room. When he investigated the laundry room, he discovered that the hub drain was not draining ("sewer drain backup"). Mr. Mills was familiar with this hub drain because he had come out only two weeks earlier to clear a blockage in it, which he accomplished with a small cable machine, or snake. He observed that the water from the sewer drain backup as well as the water that was flowing into the

laundry room from the chase had spread throughout the administration building.  Mr. Mills did not go inside any of the individual motel rooms.

After having been contacted by Mr. Alan Patel, Sunita Patel made her way to the motel and arrived at approximately 2:00 in the afternoon.  On her way there, she called her insurance agent and reported the incident.   Given that it was New Year's Eve, the agent stated a claim would not be submitted until January 2, after the New Year holiday.  When Sunita Patel entered the driveway, she also saw water in the parking lot and water seeping over the edges of all rooms.  She drove around to the backside of the motel and also observed water seeping out from Rooms 123-134.  She entered the chase and took videos of her observations.  Water remained in the chase somewhere from half an inch to an inch high, but water marks on the sides of the drywall were approximately four inches high.  She touched the drywall and found it to be soft.  She did not smell any sewer and saw no visible signs of sewer water.  She observed significant water in the laundry room, office, and apartment area and videoed her employees attempting to squeegee the water out. She then visited each of the motel rooms with staff and each room had significant water in it, some more than others.

Sunita Patel contacted Todd Brownewell on the afternoon of December 31, 2017, asking for his assistance to remove the damaged materials.   Again, because of the holiday, Mr. Brownewell was not able to visit the premises until the morning of January 2, 2018.   His observation was that the damage was caused by water.  He saw the broken pipe in the chase.  He did not see any evidence that there had been a sewer or drain backup.  He learned of the sewer drain backup from Mr. Mills later that day when Mr. Mills was working on various repairs.  Mr. Brownewell walked into and investigated each room and made the determination to mitigate all 24 first-floor rooms plus the laundry room, lobby, kitchen and apartment area.  His observation

12

was that there was water everywhere, and that any furniture touching the floor could not be salvaged because most of it was made of particle board and had absorbed the water. He made the determination that all of the rooms would be mitigated the same way because the water had at this point been sitting on the floors for 48 hours absorbing the dirt from them. Mr. Brownewell saw no evidence of "sewer" water or evidence of sewage leakage except in Rooms 133 and 134 (two rooms on the back side closest to the laundry room), where he observed that the seals around the toilets were broken, and he could see sewage seepage on the floor.

The condition of Room 119 was disputed. Mr. Allgood's photos made on January 5 showed dark residue in the tub, which he concluded came from the sewer drain backup. Mr. Brownewell said that was possible, but he also noted he had drained dehumidifiers he had used in the room into the tub and the residue could be from the humidifier. Ms. Patel testified the dark coloration came from hair dye used by the occupants of the room.

Over the next several days, Mr. Brownewell conducted the mitigation of the premises. He made a 2-foot flood cut of the drywall (he cut out the bottom 2 feet of the drywall) throughout the motel including in the walls backed up to the chase; he removed carpet, furniture, wallpaper, and draperies from the guest rooms; and he removed the tile from the bathrooms which, in most instances, necessitated removing the toilets.

As Sunita Patel's insurance agent had informed her, the proof of loss was submitted to WW on January 2, 2018. It was signed by the insurance agent and it stated "backup of sewer and drain, causing damage to several rooms." This claim was then referred by WW to Brad Allgood, an independent adjustor hired by WW to adjust the claim. Mr. Allgood received the claim as a sewer claim. He visited the Property on January 5, 2018. He visited every room and took pictures. He met Mr. Brownewell there and observed that mitigation was already three days underway. Mr.

Allgood concluded that his observations were consistent with a sewer claim as reported to WW. He stated he smelled sewer, and that the amount and type of mitigation were consistent with mitigation for a sewer leak as opposed to a clean water leak.  He particularly pointed to the removal of two feet from the drywall, as opposed to 18 inches, and the removal of the tile in the bathrooms. He learned of the broken water pipe that day or the next and reported it to WW.  Sunita Patel's insurance agent submitted a proof of loss for the water damage on January 12, 2018, stating the cause of loss as "main water line broke under the parking lot of hotel causing water damage to hotel."  Mr. Allgood submitted his initial report to WW on January 18, 2018, indicating the possibility of a second claim for damage caused by the broken water supply pipe.  By that time, he had received an invoice from Mr. Mills for repair of the water pipe.  Mr. Allgood noted in his initial report that one of his "to-do" items was "to investigate sewer backup versus water supply line leak".

Mr. Allgood revisited the property on or about January 22, 2018 to evaluate the broken water pipe in the chase and the damage caused to the chase by the broken water pipe.  He submitted a report to WW adjusting the damage to the service area (the chase) as a water damage only claim. He approved cleaning the hard floor with an anti-microbial agent and replacing drywall throughout.  He calculated the replacement cost to be $6,163.72 and the actual cash value as $5,671.76.   After application of Covington's $2,500 deductible, he authorized payment of $3,663.72 on the claim for water damage to the chase.  He did not process any portion of the chase damage as a sewer claim.

As Mr. Brownewell remediated each room, he separated items of furniture and personal property into containers based on whether they were damaged or not.   WW never inspected the personal property or attempted to inventory it or document it.  Covington, at the time of the

14

incident, was in the process of renovating and updating the motel to make it a Choice Hotel. As a result, Covington had recently purchased furniture, drapery, bedding and other personal property for the update, all of which were stored in the first-floor rooms that were not occupied by guests ("Stored Property") (the Stored Property is a subset of BPP). The Stored Property was stored in 19 of the 24 first-floor rooms.

After the mitigation, Mr. Brownewell sent a bill to WW labeled "water damage" for $84,965.52. After discussions with Mr. Allgood, he attempted to divide his time between work on sewer-damaged property and work on water-damaged property. On February 10, 2018, he sent a bill to WW marked "sewage" in the amount of $41,584.77 and another bill labeled "water" for $42,241.02. WW continued to question Mr. Brownewell's bill, arguing that some of his work could only be justified if the claim were a sewer claim as opposed to a water claim. For example, WW contended that removing all the tile, cutting the drywall two feet as opposed to 18 inches, charging for certain hazardous waste materials, and charging for extra time for supervisors and laborers were not justified for water-only mitigation. As a result, Mr. Brownewell submitted a third bill on February 15, 2018, labeled "sewage" in the amount of $74,980.31. For the first time, his bill referenced the removal of "category 3" water. This reference was not included in any of the previous bills sent to WW. This bill was paid.

The key factual issue in this case is whether all the rooms were damaged from the sewer drain backup and the water pipe break and, if so, whether the damage to the motel can be separated as to that damage caused by the water pipe break and that damage caused by a sewer drain backup. The significance to this question is that the Policy limits for sewer or drain backup are $100,000 while the Policy limits for the water pipe break is $1.9 million. WW takes the position that sewer drain backup damaged the entire premises; that the water pipe break contributed concurrently or

in any sequence to the damage caused by the sewer drain backup; that the damage cannot be separated; and that the Policy limits such coverage to $100,000.  Unfortunately, neither the insured, nor the insurer, retained an expert on the topic, took any action to test the water, or took any other action to ascertain whether backup from the sewer drain permeated all of the rooms or whether it was only water from the water pipe break that permeated all or some of the rooms.

The Court finds Covington carried its burden of showing the water pipe break damaged all the motel rooms, the chase, and the administration building.  The burden of establishing that the sewer drain backup contributed to the damage in the motel rooms and was not separable from the damage caused by the water pipe break is that of WW.  See Leonard v. Nationwide Mut. Ins. CV., 499 F. 3d 419 (5th Cir. 2007).  WW's adjustor, Mr. Allgood, concluded that the damage was caused by the sewer drain backup and not separable from the water pipe damage based on several items: the initial proof of loss was submitted as a sewer claim; the damage he observed on January 5, 2018 was consistent with a sewer claim; Mr. Brownewell could not separate the damage and performed the same remediation in all rooms; Mr. Brownewell referred to the water as category 3 water in his final bill; and Mr. Mills could not separate the damage caused by the water pipe break or the sewer drain backup.  Having reviewed all the foregoing, the Court finds that the cause of the damage to the administration building and Rooms 134 and 133 in the motel building is both the sewer drain backup and the water pipe break and the damage is not separable between the two. The Court finds that WW has not carried its burden of showing that the damage to the remaining motel rooms was caused at all by the sewer drain backup.  As to Room 119, the Court finds WW did not carry its burden of showing water from the sewer drain backup emerged in the tub, much less that it filled the tub and overflowed into the room mixing with water from the water pipe break.

16

It is important to note that water from the sewer drain backup may or may not include "sewage." The water backing up from the sewer drain (also called the hub drain) may be clear. The Court recognizes that the color of the water alone is not determinative, and the Court has considered the testimony and evidence from the date of the event, the physical layout of the building, and the testimony regarding subsequent investigations in reaching its conclusion. The Court weighs more heavily eyewitness testimony that is closer to the time of the event and gives less weight to testimony of witnesses who arrived at the scene later.

Mr. Allgood is correct that the claim as initially submitted referenced sewer. The insurance agent who submitted the claim did not testify, and the Court has no information as to why she submitted the claim as a sewer claim. Sunita Patel testified that she reported a water leak. While the Court understands why WW began with the assumption that the damage was caused by a sewer drain backup, the claim itself is not determinative of the cause of loss.

Mr. Allgood says next that the damage he observed was consistent with a sewer drain backup. It is important to note that he never investigated the cause of the damage. His only statement was that the damage was consistent with a sewer drain backup. Mr. Allgood did not visit the property until six days after the event. He stated he could smell sewer. The Court does not doubt that the smell was there, but that smell could have come from a variety of things including six days' worth of damp carpet and personal belongings.

Mr. Allgood said he relied on Mr. Brownewell. But Mr. Brownewell's testimony, while inconsistent at times, is not inconsistent when viewed as a whole. Mr. Brownewell stated that from the beginning he viewed the problem as the break in the water pipe. He was not aware there had been a sewer drain backup until he saw Mr. Mills later on January 2, who told him about cleaning out the hub drain. He testified emphatically that he believed there were two claims here,

17

both a water claim and a sewer claim, and that he felt pressured by WW to combine his bill into one sewer claim.

Mr. Brownewell conducted the mitigation in the way that he thought appropriate, which included the 2-foot cuts and the removal of tile. It was his view that, although the water was clean when it came out of the water pipe, once it hit the floor and ran across floors, including bathroom floors, and carpets that were dirty, and sat for two days before he even saw it, the rooms should be cleaned as if they were damaged by the highest level of dangerous material out of an abundance of caution. Mr. Brownewell was asked to submit multiple affidavits and letters to support WW's position (which he did), but he did not actually assess what damage was caused by what event. While it may have been a mitigator's job to assess a certain level of causation in order to ascertain the best means of mitigation, it was not his job to assess causation to the actual damage to the building. What he assessed as a mitigator was that the maximum mitigation should be done because water had been on the floor for a couple of days and he thought it was safest for future residents.

The Court finds it telling that the reference to category 3 water on which WW relies does not appear until Mr. Brownewell's third bill. Category 3 water is defined by the Institute of Inspection, Cleaning and Restoration Certification S-500 ("Standard for Professional Water Damage Restoration") as:

> grossly contaminated and can contain pathogenic, toxigenic or other harmful agents and can cause significant adverse reactions to humans if contacted or consumed. Examples of Category 3 water can include, but are not limited to: sewage; waste line backflows that originate from beyond any trap regardless of visible content or colors; all forms of flooding from seawater; rising water from rivers or streams; and other contaminated water entering or affecting the indoor environment, such as wind-driven rain from hurricanes, tropical storms, or other weather-related events. Category 3 water can carry trace levels of regulated or hazardous materials (e.g., pesticides, or toxic organic substances).

Category 2 water includes for example "overflows from toilet bowls on the room side of the trap with some urine but no feces; seepage due to hydrostatic pressure; broken aquariums and punctured water beds."  The standards also explain that category 1 water, which begins as sanitary water, and category 2 water, which contains significant contamination, can both deteriorate to the next category of water.  "Category 2 water can deteriorate to Category 3.  Once microorganisms become wet from the water intrusion, depending upon the length of time that they remain wet and the temperature, they can begin to grow in numbers and can change the category of the water."

Moreover, some of the work that Mr. Brownewell did, which WW construed as only necessary for category 3 cleanup, could also have been necessary for other reasons.  For example, much was made of the fact that the drywall was cut two feet up from the floor as opposed to 18 inches.  However, Sunita Patel testified, and Mr. Allgood confirmed, that drywall comes in 2-foot sizes and therefore many repairs may be made at a 2-foot cut for ease of installation.  Mr. Allgood thought that the removal of tile in each bathroom was evidence there had been sewage in each bathroom.  But that is not necessarily true.  Sunita Patel testified that tile is accustomed to being wet, but if it is soaked for a period of time the glue on the tiles can loosen, particularly around the edges.  Moreover, Mr. Allgood's own report includes pictures of bathrooms with the tile in place but stating that the mitigator (Mr. Brownewell) intended to remove the tile in order to be able to dry the slab.  That indicates there are reasons to remove the tile other than because it was subject to category 3 water.

Mr. Brownewell believed from the outset that this was a water claim.  He modified his description of his work to include category 3 water and he combined his claims as one sewage claim all at the behest of WW to facilitate being paid.  If Mr. Allgood thought Mr. Brownewell did work that was unnecessary, the conclusion is not that the damage is inseparable and the insured's

claim must be denied; the proper procedure would have been to reduce the amount of payment to Mr. Brownewell.

Finally, Mr. Allgood relied on Mr. Mills, who stated that he did not have a way of separating the damage to the rooms. Mr. Mills never viewed the rooms, so the fact that he could not separate the damage provides no basis for Mr. Allgood's reliance.

In sum, WW did not investigate whether the damage was caused by the water pipe break or caused by the sewer drain backup or whether it could be separated. Mr. Allgood's investigation only consisted of taking pictures; he took no independent steps to determine the cause of the loss. The evidence shows that all of the rooms were damaged by the water pipe break. That the water pipe break damaged the rooms is also logical given the water pipe break was in the chase between the two groups of rooms. No one on the site the day of the event saw any evidence of sewer damage in the rooms, other than in Rooms 134 and 133, where Mr. Brownewell saw some sewage seep through broken seals at the base of the toilets, and possibly in Room 119, which the Court addressed above.

It is also relevant that WW paid for the damage to the chase as exclusively a water claim. No explanation has been provided as to how backup from the laundry room hub drain could have flowed across the breezeway and into the rooms on either side of the chase, and all the way to the last rooms in the motel, but did not enter the chase at any point. Mr. Mills thought it highly unlikely that the water flowed out of the laundry room since there was a two-inch lip up to the breezeway from there.

The backup of the toilets in Rooms 134 and 133 is not evidence that the water from the laundry room flowed into those two rooms, but rather indicates the backup of the drain caused the ring around the toilets in those two rooms to allow seepage. No reliable evidence was presented

of any seepage of sewage or any other backup in any room other than those two, and the Court agrees with Mr. Mills that it is highly unlikely the drain backup caused the tubs and toilets to fill to a point of overflow.  It is also important to note there were only three rooms occupied on the bottom floor and six or seven occupied on the second floor at the time of the incident, so the motel was far from full.  Also, the incident occurred overnight, when less sewage is typically produced.  Mr. Allgood's testimony that he believed he saw sewage residue in other rooms six days after the event is not persuasive in light of the other testimony and his lack of independent investigation.

Eventually, repairs at Covington Lodging were made by OYO, a new franchisor for the motel.  No evidence was presented as to the amount actually spent by OYO on the repairs.  Sunita Patel expressed her opinion that, even once the repairs were completed and the motel was reopened, it was not at the same standard as before the December 31, 2017 event.  The first floor of the motel was not occupied after the event occurred on December 31, 2017 until the motel was reopened.  At the time of the incident, however, only three first-floor rooms were occupied (116, 119 and one on the backside) and the two accessible rooms (113 and 114) were available for rent.  The remaining rooms were used to store the new furniture.  The motel reopened in early September 2019.  The delay was not caused, however, by the amount of repairs needed but rather by Covington's lack of funds to complete the repairs.  The estimated time necessary to complete the repairs to the first floor of the motel was four to six weeks.  The second floor of the motel was not initially closed when the incident occurred on December 31, 2017.  At some point, however, the city required the entire motel to shut down until the repairs were completed.  No evidence was presented as to the exact amount of time that the second floor of the motel was closed, but it was in excess of six weeks.

*Damages*

Covington requested that the Court award it damages of $252,098.91 as the replacement cost for the damage to the building, $114,869.19 for the replacement cost of the BPP other than Stored Property (referred to herein as Active BPP), $124,105.37 as the cost for the Stored Property, and $136,535.81 in lost income.  The Court will make findings on each.

For the damage to the building Covington relied primarily on the replacement cost value ("RCV") estimate prepared by Mr. Allgood in his third report to WW in which he estimated the total replacement cost (cost to replace the damaged property without reduction for depreciation) to be $212,086.32.  He calculated the actual cash value ("ACV"), as RCV less depreciation, to be $197,116.00.  Included in both the RCV and ACV is Mr. Brownewell's paid invoice of $74,980.31.

In his estimate, Mr. Allgood analyzed the RCV and ACV by room.  For Rooms 134 and 133, the RCV of each is $3,218.50 while the ACV is $2,839.02.  The bathrooms of each have an RCV of $1,575.53 and an ACV of $1,445.54.  For the administration building, the RCV was estimated at $12,984.13, while the ACV was $11,494.36.

In addition to the estimate prepared by Mr. Allgood, Covington sought to recover additional items which it contended Mr. Allgood should have included in his estimate but did not. Specifically, it sought:

| | |
|---|---|
| Project management and supervision | $ 8,780.49 |
| Material handling and storage | $ 2,682.93 |
| Cleaning and waste management | $ 8,780.49 |
| Removing and replacing electrical outlets | $ 3,615.85 |
| Replacing new bathroom accessories | $11,707.32 |

The Court finds these additional items are either already in Mr. Allgood's estimate or do not need to be included in the estimate.  Project management and supervision is included in every line of Mr. Allgood's estimate under the category of overhead and profit. With respect to material storage

and handling and the cleaning and waste management, Mr. Allgood testified that these items are elements of the estimate for each individual line item. Mr. Allgood's estimate is based on "Xactimate", a computer program which includes material handling and storage and cleaning and waste management within its estimate. Additionally, Mr. Allgood's estimate specifically included a dumpster. The removal and replacement of existing electrical outlets is included in Mr. Allgood's estimate related to removing and replacing wallpaper and does not need to be separately identified. Finally, new bath accessories are not included in Mr. Allgood's estimate. The Court finds that replacement of all bathroom accessories, such as towel racks and toilet paper holders which are well off the ground and not made of a material likely to have absorbed moisture, was not established to be necessary and, therefore, the Court does not include them in the RCV or ACV of the damaged building.

The Court has determined that the damage to the administration building as well as guest Rooms 133 and 134 was caused by both the sewer drain backup and the water pipe break and is inseparable. This totals an RCV of $22,572.19 and an ACV of $20,063.48.

Mr. Brownewell also allocated his charges by room, as shown in Mr. Allgood's estimate. The portion of Mr. Brownewell's bill allocable to Rooms 133 and 134 is $4,703.92. (The RCV and ACV of Mr. Brownewell's bill are the same.) The portion of his bill allocable to the administration building is $9,968.63. The remainder of the damage to the building of $174,841.58 RCV and $162,379.97 ACV is attributable to the water pipe break and water damage only.

Covington asserted a claim for recovery of its lost and damaged Active BPP. A list of damaged personal property was admitted in evidence. No evidence was presented, however, as to the fair market value (which is how Georgia defines ACV) of the Active BPP, and no admissible evidence was presented as to the replacement cost of the Active BPP. No evidence was presented

as to the age of the property or the condition of the Active BPP.  WW did not perform any inventory or estimate with respect to Active BPP.

With respect to the Stored Property, the Court finds Covington has established the list of Stored Property that was damaged as a result of the December 31, 2017 event.  The Stored Property consisted of new and unused furniture, appliances, draperies, carpet, and other furnishings for the motel.  The Court finds the fair market value of that Stored Property is $112,487.00.  The Court arrived at this number based on the evidence presented as to the cost of the items without taking into account the cost of delivery or taxes.  Although the cost of an item is not necessarily equivalent to actual cash value, the Court is persuaded by Sunita Patel's testimony that, because this property was new and unused, depreciation is inappropriate and the purchase price is equal to the fair market value of the Stored Property.  See Champion v. Dodson, 263 Ga. App. 286 (2003).

Finally, Covington seeks lost income.  The insurance policy allows Covington to recover for the actual loss of Business Income sustained due to the necessary "suspension" of "operations" during the "period of restoration."  Business Income means "Net Income (Net Profit or Loss before income taxes) that would have been earned or incurred; and . . . continuing normal operating expenses incurred, including payroll."  Covington calculated the lost business income as an average of its monthly profit for 2017-2019 according to its tax returns.  Covington's monthly profit is calculated without including interest and depreciation.  Covington's estimate of lost income is $2,247.25 a month.  Covington multiplied the monthly alleged lost profit by eight months, equaling $17,978.00.

The Court finds Covington carried its burden of showing it lost income as a result of the damage, but the Court finds the lost income should be based on Covington's Net Profit before tax in 2017, and not a three-year average.  Given the fluctuation in income over the three-year period,

the Court finds the income closest in time to the loss is the most reliable evidence. Covington's 2017 tax return shows ordinary business income of $16,515.00. This is a result of Covington's revenue minus its cost of goods sold, operating expenses, depreciation, amortization, and interest (but not taxes). This yearly profit is equal to $1,376.25 per month or $26.47 per room per month. But, at the time of the incident, Covington only had 5 rooms available (the three it was renting plus the two accessible rooms) on the first floor and did not intend to rent the additional 19 first-floor rooms until the Stored Property was installed. Subtracting $502.92 for these 19 rooms leaves Covington with Net Profit before tax of $873.32 per month. Under the terms of the Policy and the evidence, the period of restoration is a maximum of six weeks. Therefore, Covington's maximum lost income is $1,309.98 (the monthly Net Profit times 1.5 months).

The Policy also allows the insured to recover its continuing normal operating expenses incurred. Covington itemized mortgage payments, property tax, worker's compensation, general liability insurance, and utilities. The Court finds that Covington's monthly mortgage payment was $9,000; its monthly prorated property tax was $2,144.44; its monthly worker's compensation insurance was $102.75; its monthly general liability insurance payment was $1,040.42; and its monthly utilities were $2,497.87. Covington seeks expenses for eight months, rather than the six weeks allowed under the Policy. The sum of these expenses for 1.5 months is $22,178.22.

With these facts, the Court will turn to the legal analysis.

## LAW

### *Breach of Contract*

a. Insurance Contract Interpretation

The parties agree Georgia law governs this case. In Georgia, the interpretation of an insurance policy is a question of law for the Court. O.C.G.A. § 13-2-1. The relevant rules of contract construction guide the analysis of the policy provisions. In construing an insurance

25

contract, a court must consider it as a whole, give effect to each provision, and interpret each provision to harmonize with the other.  York Ins. Co. v. Williams Seafood of Albany, Inc., 273 Ga. 710, 712 (2001) (citations omitted).  The policy should be read as a layman would read it.  Id.

"Where the terms are clear and unambiguous, and capable of only one reasonable interpretation, the court is to look to the contract alone to ascertain the parties' intent."  Winders v. State Farm Fire & Cas. Co., 359 F. Supp. 3d 1274, 1277 (N.D. Ga. 2018) (quoting Boardman Petroleum, Inc. v. Federated Mut. Ins. Co., 269 Ga. 326 (1998)).  The terms of an insurance contract should be considered in light of their legal and ordinary meaning.  Ryan v. State Farm Mut. Auto. Ins. Co., 261 Ga. 869 (1992).

If the language is ambiguous, several well-worn rules come into play.  "Any ambiguities in the contract are strictly construed against the insurer as drafter of the document; any exclusion from coverage sought to be invoked by the insurer is likewise strictly construed; and insurance contracts are to be read in accordance with the reasonable expectations of the insured where possible."  Ga. Farm Bureau Mut. Ins. Co. v. Gaster, 248 Ga. App. 198, 198-99 (2001) (citations omitted in original) (quoting Richards v. Hanover Ins. Co., 250 Ga. 613, 615 (1983)); State Farm Fire & Cas. Co. v. Walnut Ave. Partners, LLC, 296 Ga. App. 648, 650 (2009) ("Under O.C.G.A. § 13-2-2 (5), ambiguous language in an insurance contract must be construed strictly against the insurer and in favor of the insured.").  "[E]xclusions to [an insurance policy] require a narrow construction on the theory that the insurer, having affirmatively expressed coverage through broad promises, assumes a duty to define any limitations on that coverage in clear and explicit terms."  W. Pac. Mut. Ins. Co. v. Davies, 267 Ga. App. 675, 680 (2004) (citation omitted).  Accordingly, "an exclusion sought to be invoked by the insurer will be liberally construed in favor of the insured and strictly construed against the insurer when it is not clear and unequivocal[.]"  Id. (citation

26

omitted); Walnut Ave. Partners, 296 Ga. App. at 650. Finally, "a contract must be construed where possible to uphold the contract in whole and in every part, avoiding interpretations that render portions of the contract language meaningless." Id. (citing O.C.G.A. § 13-2-2 (4)); see also O.C.G.A. § 13-2-2(4) ("the whole contract should be looked to in arriving at the construction of any part"); O.C.G.A. § 33-24-16 ("Every insurance contract shall be construed according to the entirety of its terms and conditions as set forth in the policy and as amplified, extended, or modified by any rider, endorsement, or application made a part of the policy.").

   b. Burdens

   Under Georgia law, to establish a prima facie case on a claim under an insurance policy, the insured must prove coverage under the policy. In other words, the insured must show the uncompensated or undercompensated damage was caused by a covered peril. See Calabro, 253 Ga. App. at 97. The insured has the burden to prove the damages are covered and the amount of those damages. Yaniz v. Wright Nat'l Flood Ins. Co., 446 F. Supp. 3d 1015, 1027-28 (S.D. Fla. 2020).

   Once an insured has met this initial burden, the burden then shifts to the insurer to prove that the loss falls within a policy exclusion or limitation. See Crawford, 296 Ga. App. at 460.

> [T]o negate coverage by virtue of an exclusion, an insurer must establish that the exclusion is stated in clear and unmistakable language, is subject to no other reasonable interpretation, and applies in the particular case . . . . The burden, a heavy one, is on the insurer . . . , and if the language of the policy is doubtful or uncertain in its meaning, any ambiguity must be resolved in favor of the insured and against the insurer.

Dream Spa, Inc. v. Fireman's Fund Ins., 2008 WL 355458, at *5 (S.D.N.Y. Feb. 6, 2008) (citation omitted).

   Where at least some of the damage is covered, the insurer has to prove how much of the damage is excluded from coverage under the policy. Dickerson v. Lexington Ins. Co., 556 F.3d

290, 295 (5th Cir. 2009); see also Leonard, 499 F.3d 419 (the insurer had the burden of proving what portion of the total loss was attributable to water damage and was thus within the water damage exclusion); Matthews v. Allstate Ins. Co., 731 F. Supp. 2d 552, 564 (E.D. La. 2010). "[T]he absence of evidence does not prove the exclusion applies." Hathaway Dev. Co. v. Am. Empire Surplus Lines Ins. Co., 301 Ga. App. 65, 70 (2009). Thus, if the insurer cannot segregate excluded damage from covered damage, the exclusion does not apply. See Imperial Trading Co., Inc. v. Travelers Property Cas. Co. of America, 638 F. Supp. 2d 692 (E.D. La. 2009).

The degree of proof required for both coverage and exclusions is a preponderance of the evidence. See Tuck, 115 Ga. App. at 570 (burden of proof on insured to prove by a preponderance of the evidence the loss resulted from a hazard against which the policy afforded protection); Gulf Life Ins. Co., 82 Ga. App. 136 (where a "policy contains an excepting clause, where the insurance company relies upon the excepting clause in order to establish its non-liability it must prove this contention by a preponderance of the evidence"); Miller Marine Servs. v. Travelers Prop. Cas. Ins. Co., 2005 WL 2334385, at *4 (E.D.N.Y. Sept. 23, 2005) ("[insured] has the burden of coming forward with a preponderance of competent evidence that [the event] was caused by a covered occurrence…[and] burden is on insurers to show, by a preponderance of evidence, that an exception to coverage applies."); Preis v. Lexington Ins. Co., 279 F. App'x 940, 944 (11th Cir. 2008). If there is a dispute, "[t]he segregation or allocation of the causes of the loss is left to the finder of fact once the parties have met their initial burdens." 279 F. App'x at 944.

c.  Anti-Concurrent Cause Clauses

28

When multiple events occur simultaneously causing inseparable damage, some of which events are covered causes of loss and some are not, the terms of the policy govern the coverage. If no policy provisions govern the situation, courts look to the doctrine of efficient proximate cause to determine if the damage is covered or excluded.  See Burgess v. Allstate Ins. Co., 334 F. Supp. 2d 1351, 1359–60 (N.D. Ga. 2003).  The doctrine is well-grounded in Georgia and applies when two causes combine to create a loss.  Id.  It governs situations where a risk specifically insured against sets other causes in motion in an unbroken sequence between the insured risk and the ultimate loss.  Id.  "When an insured can identify an insured peril as the proximate cause, then there is coverage even if subsequent events are specifically excluded from coverage." Id. (citations omitted).  "[W]here an excluded peril contributes to a loss, an insured may recover only if a covered peril is the efficient and proximate cause of the loss[,]" i.e. the one that sets the other causes in operation.  Ken Johnson Properties, LLC v. Harleysville Worcester Summary Ins. Co., 2013 WL 5487444 (D. Minn. Sept. 30, 2013).  "Conversely, if an excluded peril is the efficient and proximate cause of the loss, then coverage is excluded."  Id.

Parties, however, can contract around these default rules with an anti-concurrent cause ("ACC") provision.  When damage arises from multiple causes, an ACC provision circumvents the doctrine of efficient proximate cause and bars coverage where the loss is caused by a combination of covered and excluded perils.  See generally Dale Joseph Gilsinger, Validity, Construction, and Application of Anticoncurrent Causation (ACC) Clauses in Insurance Policies, 37 A.L.R.6th 657 (2008 & Supp. 2014); Boazova v. Safety Ins. Co., 462 Mass. 346, 357 n.4 (2012). "When an anti-concurrent loss provision is triggered, therefore, courts need not inquire into which of a covered or excluded loss was the proximate cause of the damage, but simply exclude coverage where any portion of the loss was caused or contributed to by an excluded loss."  Ken Johnson

Props., 2013 WL 5487444 at *12.  Some clauses may also bar recovery when two causes operate in succession to cause inseparable damage.  See Downs Ford, Inc. v. Zurich Am. Ins. Co., 2021 WL 1138141, at *6 (D.N.J. Mar. 25, 2021) ("An anti-concurrent causation or anti-sequential causation clause will 'exclude coverage when a prescribed excluded peril, alongside a covered peril, either simultaneously or sequentially, causes damage to the insured.'").

An ACC provision does not apply if two or more forces cause different, distinct, divisible damage.  If two perils cause two different losses, the forces are not working concurrently but separately and, therefore, the ACC provision is not implicated.  5 New Appleman on Insurance Law Library Edition § 44.04.  For example, "[i]f wind (not excluded) causes one type of damage and flood (excluded) causes another type of damage, then the wind-caused damage is covered and the flood-caused damage is not.  The anti-concurrent cause provision is irrelevant."  See id. Moreover, "[a]n anti-concurrent causation clause is only applicable where there is *both* a covered loss and an excluded loss."  Erie Ins. Prop. v. Chaber, 239 W. Va. 329, 335 (2017).  Where both of the alleged causes are covered by the insurance policy, the ACC clause is not applicable.  See id. at 335 n.7.

Here, the Policy includes an ACC clause.  There is also a Water Exclusion, which provides coverage for certain water-related events but not others.  A Sewer Endorsement partially supplants the Water Exclusion to provide coverage for direct physical loss or damage caused by or resulting from non-flood related discharge of water or waterborne material from a sewer, drain or sump on the premises.  WW contends this endorsement adds back limited coverage in the amount of $100,000 and, after that is paid, the Water Exclusion and ACC clause limit further recovery.  Although WW acknowledges that the Sewer Endorsement effectively nullifies aspects of the Water Exclusion, it contends that the existence of the ACC clause as part of the original

30

policy renders it applicable above the $100,000 sublimit.  It contends the damage to the motel was caused by both the sewer drain backup and the water pipe break, the damage was inseparable, and the ACC clause applies once the sewer limit was reached to eliminate any other coverage. Covington argues the ACC clause does not apply because the sewer drain backup did not damage the entire motel and, in any event, the Sewer Endorsement effectively nullified the ACC language.

    i.    <u>Factual Application of ACC Clause</u>

    The factual question is, without reaching WW's legal contract construction analysis, was the damage caused by two perils and, if so, was the damage inseparable?  Concurrent causes are independent causal events that operate simultaneously to create a loss.  5 New Appleman on Insurance Law Library Edition § 44.03 (2021).  Conversely, causes are separate when they do not act in conjunction.  <u>See</u> <u>Corban v. United Servs. Auto. Ass'n</u>, 20 So. 3d 601, 615 (Miss. 2009) (citing Webster's II New College Dictionary at 234; Black's Law Dictionary at 363 (defining "concurrent" as "[r]unning together; . . . acting in conjunction; . . . contributing to the same event; contemporaneous")).  Perils that act in sequence to cause different damage are also separate.  <u>See</u> <u>Downs Ford, Inc.</u>, 2021 WL 1138141, at *6.  The parties agree the burden is on WW, as the insurer, to prove the damage was caused by both events and was inseparable.

    As stated above, the Court finds WW proved by a preponderance of the evidence that the damage to the administration building was caused by both the sewer drain backup and the water pipe break and was inseparable.  The sewer drain (hub drain) backed up in the laundry room and spread throughout the administration building.  To the extent the water from the pipe break caused or contributed to the drain back up, it was a concurrent cause.  The damage to Rooms 133 and 134 was also caused by both events and is inseparable.  As such, factually, the ACC clause could apply to this damage.

As to the other rooms, the Court has found the damage was caused by the water pipe leak only.  WW did not carry its burden of showing the sewer drain backup contributed to the damage here.  Consequently, the ACC clause does not apply to these other rooms.

Damage to the administration building as well as guest Rooms 133 and 134, where the water and sewer was inseparable, totals an RCV of $22,57.219 and an ACV of $20,063.48.  This is less than the sewer sublimit, which WW concedes provides coverage for sewer related damage up to $100,000.  On these facts, the legal issue of how to read the ACC clause with the endorsement above $100,000 does not arise.

      ii.    <u>Legal Analysis of ACC Clause</u>

Even if all rooms were damaged by both the water pipe break and the sewer drain backup and the damage was inseparable, the Court concludes the ACC clause does not apply here because of the Sewer Endorsement.

The Sewer Endorsement cannot be examined in a vacuum.  An endorsement is part of the insurance policy, <u>Thompson v. State Farm Fire & Cas. Co.</u>, 264 F. Supp. 3d 1302 (M.D. Ga. 2017), and the Court must consider the language in concert with other policy language.  <u>See</u> <u>Walnut Ave. Partners</u>, 296 Ga. App. at 650.  "[I]n construing an insurance contract, a court must consider it as a whole, give effect to each provision, and interpret each provision to harmonize with the others."  <u>See</u> <u>Auto-Owners Ins. Co. v. Parks</u>, 278 Ga. App. 444, 446 (2006) (citation omitted).  When there is a conflict between an endorsement and the main policy, the terms of the endorsement apply, "for it is a general principle of wide application in Georgia that when an endorsement or rider and a policy conflict, the former controls the latter, since it is a later expression of intent."  <u>B. L. Ivey Constr. Co. v. Pilot Fire & Cas. Co.</u>, 295 F. Supp. 840, 847 (N.D. Ga. 1968).

32

Cases are split about how an endorsement providing limited coverage should be read together with an ACC provision and whether the ACC provision bars recovery for damage above the endorsement's limit of liability. Some courts have found an ACC provision wholly inapplicable when an endorsement provides coverage for a loss. For example, <u>Ken Johnson Props.</u>, 2013 WL 5487444, involved a water-damaged roof. The policy provided: "We will pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss." The policy defined a covered cause of loss as "[r]isks of direct physical loss," unless the loss is specifically excluded in Paragraph B of the policy's exclusions section or limited in Paragraph 4 of the policy's limitations section. Paragraph B of the policy excluded coverage for certain water-related damages, providing the insurer:

> will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss. These exclusions apply whether or not the loss event results in widespread damage or affects a substantial area.
> ....
> g. Water
> ....
> (3) Water that backs up or overflows from a sewer, drain or sump[.]

A water endorsement brought certain water damage back within the scope of coverage. The water endorsement provided:

> A. We will pay for direct physical loss or damage to Covered Property, covered under Section I—Property, caused by or resulting from:
> 1. Water or waterborne material which backs up through or overflows or is otherwise discharged from a sewer or drain; or
> 2. Water or waterborne material which overflows or is otherwise discharged from a sump, sump pump or related equipment even if the overflow or discharge results from mechanical breakdown of a sump pump or its related equipment.
> ....

C. The most we will pay per location for the coverage provided under this endorsement is $25,000 unless a higher Water Back–Up and Sump Overflow Limit of Insurance is shown in the Declarations as applicable to a specified premises and then such limit applies to the premises so designated.

The coverage provided by the Water Back–Up and Sump Overflow endorsement is subject to the Limits of Insurance of Section I—Property and as such will not increase the Limits of Insurance provided in this policy.

The endorsement stated "[w]ith respect to the coverage provided under this Endorsement, the Water Exclusion in Section I—Property, is replaced by the following exclusion[.]"

The insurer argued that the ACC provision precluded coverage because an excluded cause (damage in excess of $25,000 caused by water backing up from a drain) contributed, at least partially, to the loss. The court disagreed. It found the ACC clause did not apply because an ACC provision only applies when two perils, one covered and one not, combine to cause inseparable damage, and coverage for damage resulting from a backed-up water drain was *not* excluded under the policy due to operation of the water endorsement. The water endorsement specifically amended the policy's exclusionary language. Therefore, pursuant to the water endorsement, damage caused by water that backs up from a drain was no longer excluded. Because water that backs up from a drain was no longer part of the policy's exclusion section, it was no longer subject to the ACC clause that prefaced that section. The insurer argued the exclusion somehow reverted back into the policy's exclusion section after $25,000 (the limit under the water endorsement) of damage caused by water that backs up or overflows from a sewer, drain or sump. The court found the argument unpersuasive. The endorsement removed the exclusion and did not reinsert it once the cap on coverage was reached.

Other courts have found that when the relationship between an endorsement and an ACC provision is ambiguous, the provisions should be construed in favor of the insured. In Bishops,

Inc. v. Penn Nat. Ins., 2009 PA Super 225 (2009), for example, a sewer and drain back-up was

followed by extensive flooding of the business premises during a hurricane.  The policy provided:

> B. EXCLUSIONS
> 1. We will not pay for loss or damage caused directly or indirectly by any of the
> following. Such loss or damage is excluded regardless of any other cause or event
> that contributes concurrently or in any sequence to the loss.
> * * *
>> g. Water
>>> (1) Flood, surface water, waves, tides, tidal waves,
>>> overflow of any body of water, or their spray, all
>>> whether driven by wind or not.
>>> . . .
>>> (3) Water that backs up or overflows from a sewer,
>>> drain or sump;
>>> . . .

Had the content of this exclusion remained unaltered, the loss would not be covered.  However,

the policy contained an endorsement, the effect of which was disputed.  It provided:

> II. Additional Coverages
>
> The following Additional Coverages are added;
>
>> f. Back Up of Sewers and Drains
>>
>> We will pay for loss or damage to Covered Property caused by a
>> back up from a sewer or drain or an overflow from a sump within
>> the building at the described premises.
>>
>> The most we will pay for each location under this Additional
>> Coverage is $5,000 for the sum of all expenses arising from back
>> up or overflow during each 12 month period of the policy.
>>
>> Exclusion B.1.g.(3) does not apply to this Additional Coverage.

The parties agreed any damage caused solely by the backup or overflow from the sewers and drains

*would* be a "Covered Cause of Loss" under the policy (at least up to the $5,000 limit set forth in

the endorsement).  The endorsement specifically removed Exclusion B.1.g.(3) of the basic policy

and did not restate the ACC language.

The court acknowledged that, on the one hand, an insurer might seek to deny coverage on the basis of the ACC language in the main policy.  On the other hand, an insured might reasonably conclude that the coverage purchased eliminated both the specified limitation concerning sewer and drain back-up and the preliminary ACC language.  The court stated the fact that the insured paid an added premium for coverage under the endorsement was a significant indicator of the parties' intent and the insured's expectations that such damage would be covered.  The court found the language ambiguous and, construed in favor of the insured, provided coverage.

Some courts have found that an ACC provision continues to apply even with an endorsement.  For example, in Hartman v. Erie Insurance Company, 85 N.E.3d 454 (Ohio Ct. App. 2017), the policy included an ACC clause that was followed by exclusions:

These four water damage exclusions exclude coverage for losses caused:
9. by water damage, meaning:

    a.  flood, surface water, * * * storm surge or overflow of a body of water.

    b.  water or sewage which backs up through sewers or drains or water which enters into and overflows from within a sump pump, sump pump well or any other system designed to remove subsurface water which is drained from the foundation area.

        **This exclusion** does not apply if Sewers or Drains Backup Coverage is shown on the 'Declarations.' However, the maximum amount shown on the 'Declarations' is the maximum amount 'we' will pay for any one direct loss caused by water or sewage which backs up through sewers or drains, or which enters into and overflows from within a sump pump, sump pump well or any other system designed to remove subsurface water which is drained from foundation area;

    c.  water below the surface of the ground. This includes water which exerts pressure on, or flows, seeps or leaks through any part of a building or other structure, including sidewalks, driveways, foundations, pavements, patios, swimming pools or decks; or

36

       d.   waterborne material carried or otherwise moved by any of the
           water referred to in this exclusion. . . .

The insured purchased the "backup coverage endorsement" referenced in paragraph 9.b, which simply provided: "'You' have purchased Sewers or Drains Backup Coverage in the amount shown on the 'declarations.' The SECTION 1 policy deductible applies." The court found the endorsement only modified the language of the exclusion, paragraph 9.b, to add coverage that would otherwise have been excluded. The court found the endorsement did not provide additional protection for damage caused by a combination of covered and non-covered causes and that the ACC provision continued to apply. The court noted the endorsement could have had some benefit if a loss was only from water backing up through sewers or drains but, when damage was also occurring as a result of surface flooding, coverage was excluded. See also Chateau Vill. N. Condo. Ass'n v. Am. Fam. Mut. Ins. Co., 170 F. Supp. 3d 1349, 1356-57 (D. Colo. 2016) (stating "[i]f the language from the endorsement replaces the original language in the policy, policy provisions that related to or affected the original language will similarly relate to or affect the new language provided by the endorsement" and finding "no apparent reason why the ACC should not apply to the language of the new Exclusion B.1.g in the same manner it applied to the original language."); Lead GHR Enters., Inc. v. Am. States Ins. Co., 369 F. Supp. 3d 909, 929–30 (D.S.D. 2019) (finding Ken Johnson Props. factually inapposite and concluding "[n]o modification to the policy here removes the anti-concurrent causation provision's exclusion of earth and water movement.").

WW cites For Kids Only Child Dev. Ctr., Inc. v. Phila. Indem. Ins. Co., 260 S.W.3d 652 (Tex. App. 2008), in support of its argument that the endorsement provides coverage but only up to a point and, once the limit of sewer coverage has been reached, the ACC clause kicks in and the remaining damages caused by a combination of water and sewer are not covered. In For Kids Only Child Dev. Ctr., an endorsement "added and supersedes any wording to the contrary under

the Cause of Loss Special form."  The court found that, rather than constituting a blanket repeal of

the sewer and drain backup exclusion in the Causes of Loss–Special Form, the endorsement

superseded only that portion of the language that was "to the contrary."  Id. at 656.  It provided for

the recovery of "not more than $25,000 in any one occurrence."  Id.  The court noted the sewer

backup was not a covered cause of loss on the Causes of Loss–Special Form and no language in

the endorsement changed the sewer backup into a "covered cause of loss" beyond the limited grant

of the endorsement.  See also Troutman v. QBE Ins. Corp., 2018 WL 2741060 (W.D.N.C. June 6,

2018) ("plaintiffs' argument that definitions in the limited endorsement supersede those of the

original policy is unavailing.  Such wholesale replacement of terms of the base policy by an

expressly 'limited' coverage that provides a highly specific sublimit defies the clear intent of the

limited endorsement and cannot be read to supersede the original policy in its entirety.").

Here, the insurance policy is clear about how to place the Water Exclusion in the Policy:

the Water Exclusion modifies Causes of Loss – Special Form B.1.g.  But the Policy is not clear

about where the Sewer Endorsement fits, which makes it ambiguous.  Ms. Taff for Covington and

Mr. Livingston for WW testified about how to resolve the ambiguities.

According to Ms. Taff, the Sewer Endorsement deletes and replaces subparagraphs 3 and

5 of the Water Exclusion.  Thus, according to Ms. Taff, the Policy should read:

> B. Exclusions
> 1. We will not pay for loss or damage caused directly or indirectly by any of the
> following.  Such loss or damage is excluded regardless of any other cause or event
> that contributes concurrently or in any sequence to the loss.
>> g. Water.
>>> (1) Flood, surface water, waves (including tidal wave and
>>> tsunami), tides, tidal water, overflow of any body of water,
>>> or spray from any of these, all whether or not driven by
>>> wind (including storm surge);
>>> (2) Mudslide or mudflow;

(3) Water that backs up or overflows or is otherwise
discharged from a sewer, drain, sump, sump pump or
related equipment;
(4) Water under the ground surface pressing on, or flowing
or seeping through:
        (a) Foundations, walls, floors, or paved
surfaces;
        (b) Basements, whether paved or not; or
        (c) Doors, windows, or other openings; or
(5) Waterborne material carried or otherwise moved by any
of the water referred to in Paragraph (1), (3) or (4) or
material carried or otherwise moved by mudslide or
mudflow.

Mr. Livingston, on the other hand, reads the $100,000 limitation of liability in the Sewer

Endorsement into the exclusion language of the Cause of Loss – Special Form.  His version would

read:

B. Exclusions
1. We will not pay for loss or damage caused directly or indirectly by any of the following.
Such loss or damage is excluded regardless of any other cause or event that contributes
concurrently or in any sequence to the loss.
        g. Water.
                (1) Flood, surface water, waves (including tidal wave and tsunami), tides,
                tidal water, overflow of any body of water, or spray from any of these, all
                whether or not driven by wind (including storm surge);
                (2) Mudslide or mudflow;
                (3) Water that backs up or overflows or is otherwise discharged from a
                sewer, drain, sump, sump pump or related equipment <u>above the applicable
                Discharge Limit shown in the Schedule</u>;
                (4) Water under the ground surface pressing on, or flowing or seeping
                through:
                        (a) Foundations, walls, floors, or paved surfaces;
                        (b) Basements, whether paved or not; or
                        (c) Doors, windows, or other openings; or
                (5) Waterborne material carried or otherwise moved by any of the water
                referred to in Paragraph (1), (3) or (4) or material carried or otherwise
                moved by mudslide or mudflow <u>above the applicable Discharge Limit
                shown in the Schedule</u>.

Looking at the contract as a whole, construing ambiguities in favor of the insured

(Covington) and construing exceptions narrowly against the insurer (WW), as the Court must, the

Court agrees with Covington's interpretation. The Sewer Endorsement eliminated contrary language in the Water Exclusion. Then, the sewer damage was no longer an <u>excluded</u> cause of loss. It was a covered cause of loss with a limit.

The structure of the Policy also supports this conclusion. For one, exclusions and limitations are identified differently in the Causes of Loss – Special Form. The ACC clause applies to the exclusions paragraph, *not* to the limitations paragraph. It also talks about <u>causes</u>, not limitations of liability. It states, "We will not pay for loss or damage <u>caused</u> directly or indirectly by any of the following. Such loss or damage is excluded regardless of <u>any other cause</u> or event that contributes concurrently or in any sequence to the loss." (emphasis added). Coverage may be <u>limited</u> (to $100,000), but it was not wholly excluded. Since the ACC clause applies to excluded causes, it would not apply to damage from a drain backup once such cause was no longer excluded by operation of the Sewer Endorsement. Further, the limitation of liability of $100,000 is not in the text of the Sewer Endorsement, contrary to how other limitations appear in the Policy. For example, the Policy includes a dollar limitation in the substance of the endorsement relating to fungus. Due to the operation of the Sewer Endorsement, discharge of water or waterborne material from a sewer, drain or sump is a covered cause of loss. Because both water and sewer are covered, the ACC provision does not apply.

Covington's reasonable expectation was that the coverage purchased for an added premium eliminated the specified exclusion concerning sewer and drain back-up, and that it was buying additional coverage for both water and sewer damage. But WW's argument would <u>limit</u> Covington's coverage to a sewer claim only and provide Covington no benefit from the water coverage, even while sewer and water are both covered claims. Covington's interpretation, on the other hand, provides meaning to all parts of the Policy. Water damage is covered to the full extent

40

of the Policy limits.  Sewer damage (alone) is limited to $100,000.  But both are covered causes

of loss and the total maximum coverage for both losses is $1.9 million.

An exclusion must be clear and unmistakable, and the policy must not be subject to any

other reasonable interpretation.  Dream Spa, 2008 WL 355458 at *5.  The Sewer Endorsement and

Policy here are not either.  Applying all the rules of contract construction compels the Court to

conclude the Sewer Endorsement added its coverage and deleted the exclusion otherwise in the

Policy.  Since the damage here was caused by two covered causes of loss, the ACC provision does

not apply.  Rather the question is how to apply the different limits of liability.

d. Sublimits

If the damage to the Property was caused by or resulted from two covered events—a water

pipe break and sewer drain backup—and the damage is inseparable, the Court holds that the ACC

provision does not apply and WW must pay for the damage.  But how much?  In an event involving

multiple causes different sublimits may apply.  See Altru Health Sys. v. Am. Prot. Ins. Co., 238

F.3d 961, 964 (8th Cir. 2001) ("multiple sublimits may apply to any one loss"); Penford Corp. v.

Nat'l Union Fire Ins. Co., 2010 WL 300838 (N.D. Iowa Jan. 19, 2010) (recognizing more than one

sublimit might be triggered in any loss); see also Ernest Martin, Jr., Recent Developments in

Disaster Coverage: What to Look Out for in Today's Commercial Property Policies, 2011 WL

2532996, at *7 (June 2011).  That is the case here, as the Policy provides coverage for losses

caused by water backing up or overflowing through a drain (albeit limited to $100,000) and also

provides coverage for water damage up to $1.9 million.

Some policies may specifically provide that, when two sublimits apply, the lower sublimit

limits coverage.  For example, in Altru Health Sys. v. Am. Prot. Ins. Co., 238 F.3d 961 (8th Cir.

2001), the policy provided, "All liability for loss or expense under this Policy for any one

occurrence shall not exceed the smallest of . . . any applicable sublimits of liability entered elsewhere in the Policy." Id. at 964.  Other policies may provide general limits of liability are "in addition to" endorsement sublimits.  See Baylor Coll. of Med. v. Am. Guarantee & Liab. Ins. Co., 2002 WL 35644976, at *11 (S.D. Tex. Oct. 30, 2002).

In the absence of language specifically addressing sublimits, policies may provide for an insured to recover under more than one coverage of a policy, as long as the insured does not receive more than the amount of his loss.  See Hit Factory, Inc. v. Royal Ins. Co. of Am., 2005 WL 2125803 (S.D.N.Y. Aug. 24, 2005); see also 12 Couch on Ins. § 169:6.  In such cases, how do you allocate the loss?  The court in Hit Factory, considered whether to use the efficient proximate cause theory to allocate losses with different sublimits, but it rejected the notion.  There, the loss involved water damage resulting from both flooding caused by rain and an apparent drain backup.  The policy included a provision entitled "Insurance Under Two or More Coverages" which provided, "If two or more of this policy's coverages apply to the same loss or damage, we will not pay more than the actual amount of the loss or damages."  The insurer made payments exhausting the policy's flood sublimit, which was less than the amount of the loss, but declined to make additional payments under a separate sublimit for drain backup as it contended the loss was proximately caused by flood.  The court, though, rejected the efficient proximate cause analysis.  The court reasoned that because the plaintiff was not suing "under a policy for damages caused by two perils, one of which is covered under the policy and the other is not, and where the insurance company is denying coverage" the proximate cause analysis should not apply.  Id. at *5; see also Ken Johnson Props., 2013 WL 5487444, at *14 ("the efficient proximate cause inquiry undertaken by courts to distinguish between covered and excluded causes of loss is not the appropriate inquiry when presented with two covered causes of loss.").

In <u>Ken Johnson Props.</u>, the court decided that construction of the policy required payment of the full amount of the damage.  The court "found no legal principle or any portion of the Policy that would require or permit the Court to interpret the Policy as affording only the lowest possible amount of coverage where two covered causes contribute to a loss." <u>Id.</u>  It noted the two coverages were not meant to replace each other, and that limiting payment to the lowest sublimit essentially rendered the other coverage a nullity.  <u>Id.</u> at *15.  The limitation of payment to the lowest sublimit was a breach by the insurer of its contract.

Ms. Taff, who was admitted as an expert on insurance policy interpretation, testified, similar to the court's finding in <u>Ken Johnson Props.</u>, that if an event was caused by two covered causes of loss with different sublimits, the insurer would pay for damages caused exclusively by the peril with the lower sublimit, up to that sublimit, and would pay for other damages under the general limits of liability, up to the actual amount of the loss or damages.

Here, the Policy does not expressly limit all damages to the lower sublimit.  It does provide that the Sewer Endorsement sublimit does not increase the total limit of $1.9 million.  It also includes the same language set out in <u>Hit Factory</u>.  The Policy provides: "If two or more of this policy's coverages apply to the same loss or damage we will not pay more than the actual amount of the loss or damage." The Court finds the Policy is ambiguous about how to read the Sewer Endorsement sublimit with the general limits of liability.  The Court relies on Ms. Taff's testimony about how to apply sublimits of two covered causes and applies the rules of contract construction in concluding that Covington can recover under both sublimits, up to the actual amount of damage.  This construction is not inconsistent with any provision of the contract, construes the limits in favor of the insured, and reads the contract as a whole.  Limiting the entire cause of loss to the $100,000 sewer limit when both water and sewer are covered causes of loss effectively

43

eliminates the water coverage from the Policy. To the extent an element of damage is caused only by the sewer drain backup, the coverage is limited to $100,000. But to the extent the damage is caused by the water pipe break and the sewer drain backup, the limit of $1.9 million applies. Thus, all of Covington's damage is covered by the $1.9 million policy limit.

### *Damages*

The insured is required to prove "resultant damages" as an element of its claim of breach of contract under Georgia law. Grand Rsrv. of Columbus, LLC v. Prop.-Owners Ins. Co., 721 F. App'x 886, 889 (11th Cir. 2018) (citations omitted). "It is the plaintiff's burden to prove the amount he can recover. The court may not guess the reasonable price for repairs covered under the policy." Mahood v. Omaha Prop. & Cas., 174 F. Supp. 2d 284, 293 (E.D. Pa. 2001); see also Yaniz, 446 F. Supp. 3d at 1027-28 ("failure to prove the specific, additional amount owed under the [policy] precludes any further award. The Court is not permitted to, and will not, speculate as to damages.") (internal citation omitted).

a.  Building

In Georgia, the basic measure of loss is ACV, which is equivalent to the fair market value of the property at the time of loss. Am. Cas. Co. of Reading, Pa. v. Parks-Chambers, Inc., 111 Ga. App. 568, 569–70 (1965) (citing National Fire Ins. Co. v. Banister, 104 Ga. App. 13 (1961)). As explained by the Georgia Court of Appeals, "[t]he primary obligation of the defendant insurance company under these provisions was to insure the owner to the extent of the *actual cash value* of the property at the time of loss, the correct measure of its liability being the difference between the value of the property immediately before the injury and its value immediately afterwards." Id. at 569-70 (citing Dependable Ins. Co. v. Gibbs, 218 Ga. 305, 315 (1962)). RCV policies provide greater coverage than ACV policies. 12A Couch on Ins. § 176:1 (citing Trinidad v. Florida

Peninsula Ins. Co., 121 So. 3d 433 (Fla. 2013)); see also Johnny Parker, Replacement Cost

Coverage: A Legal Primer, 34 Wake Forest L. Rev. 295 (1999).  While ACV makes the insured

responsible for bearing the cash difference necessary to replace old property with new property,

replacement cost allows recovery for the actual value of property at the time of loss, without

deducting depreciation.  12A Couch on Ins. § 176:56

        Here, the Policy provides that RCV (without deduction for depreciation) replaces ACV in

the Valuation Loss Condition.  It then gives Covington an option to make a claim for loss based

on ACV or RCV: "You may make a claim for loss or damage covered by this insurance on an

[ACV] basis instead of on a [RCV] basis.  In the event you elect to have loss or damage settled on

an [ACV] basis, you may still make a claim for the additional coverage this Optional Coverage

provides if you notify us of your intent to do so within 180 days after the loss or damage."  The

Policy further provides, "We will not pay on a replacement cost basis for any loss or damage: (1)

Until the lost or damaged property is actually repaired or replaced; and (2) Unless the repairs or

replacement are made as soon as reasonably possible after the loss or damage."  Replacement cost

is not otherwise defined in the Policy.  Covington is seeking damages to the building based on

RCV.

        Per the terms of the Policy, the insured must actually make repairs to claim RCV.  "Without

actual repair or replacement, the insurer [has] no liability beyond the ACV of the loss."  Bosse v.

Access Home Ins. Co., 267 So. 3d 1142, 1146 (La. Ct. App. Dec. 17, 2018).  Requiring actual

repair or replacement as a condition precedent to the recovery of replacement costs prevents "an

insured from making a profit from a loss.  When a policy distinguishes between coverage for actual

loss, which considers depreciation as a component to value, and the cost of rebuilding, which does

not consider depreciation, an insured can profit by receiving replacement costs which are not then

used to replace property which depreciated in value prior to the loss." <u>Conrad Bros. v. John Deere Ins. Co.</u>, 640 N.W.2d 231, 239–40 (Iowa 2001) (internal citations omitted). Georgia courts have upheld policy requirements that the insured must actually replace the property before the insured is entitled to recover full replacement cost benefits. See <u>Marchman v. Grange Mut. Ins. Co.</u>, 232 Ga. App. 481 (1998).

It is undisputed that repairs were made to the Property. WW contends, however, that Covington cannot claim RCV because the repairs were made by a third party, OYO. In some cases, insureds have been denied replacement costs where the property is sold to a third party who then makes the necessary repairs. See <u>Paluszek v. Safeco Ins. Co. of Am.</u>, 164 Ill. App. 3d 511 (1987). In other cases, courts have allowed the insured to recover RCV where repairs were completed by a third party. For example, in <u>Machson v. Wausau Underwriters Ins. Co.</u>, 1986 WL 8179 (Del. Super. Ct. July 24, 1986), the insured owned premises that were leased for use as a restaurant. The restaurant was destroyed by fire. The insured made a new lease agreement with a restaurant chain, which agreed to rebuild and replace the destroyed premises at its own expense. The insured owner sought recovery of the costs of rebuilding under the replacement cost endorsement of her policy. The insurer refused to pay because the franchisor, not the insured, paid for the replacement. The court pondered whether the insured, in effect, paid for the replacement by giving up other substantial rights in its agreement with the franchisor. It noted that, had the insured employed a general contractor to rebuild the property, obtained a construction mortgage to finance the rebuilding and the mortgagee-bank paid the contractor in stages, the procedure would appear to satisfy the terms of the policy. "The fact that plaintiff did not make the payments should be immaterial." <u>Id.</u> at *3. Similarly, in <u>Edgewood Manor Apartment Homes, LLC v. RSUI Indem. Co.</u>, 733 F.3d 761 (7th Cir. 2013), the court declined to "read a 'repair it yourself'

46

requirement into a replacement-cost provision in the absence of specific policy language imposing that condition on recovery." Id. at 775.

Here, Covington did not sell the Property. It entered into a new franchise agreement and its franchisor, OYO, completed the necessary repairs. The Policy states WW will not pay "[u]nless the repairs or replacement are made as soon as reasonably possible"; it does *not* state repairs must be made by Covington or by the insured specifically. The next paragraph provides, "We will not pay for loss or damage to tenants' improvements and betterments if others pay for repairs or replacement." This language evidences that the Policy could have included a similar requirement that the insured pay for the repairs in order to recover replacement cost, but it did not. As in Edgewood Manor Apt. Homes, the Court declines to read into the Policy a requirement for Covington to pay for all the repairs itself.

But even if a third party pays for the repairs, the burden is on the insured to show the actual cost of repair in order to recover the difference between ACV and RCV. Covington provided no evidence of the actual amount spent to repair the building. Further, Sunita Patel testified that, even once the repairs were completed and the motel was reopened, it was not at the same standard as before the December 31, 2017 event, so it is not evident the repairs restored the Property to the same condition it was in before the incident. Without any evidence of the actual repair or replacement costs, WW has no liability beyond the ACV of the loss.

WW, however, has not fully paid the ACV of the Building. The damage to the administration building as well as guest Rooms 133 and 134 was caused by both the sewer drain backup and water pipe break and is inseparable. The ACV of the administration building and Rooms 133 and 134, including the allocable portion of Mr. Brownewell's bill is $34,736.03. This is fully covered by the Sewer Endorsement and has been fully paid by WW. The damage to the

remainder of the Building was caused only by the water pipe break.  The ACV for the remaining

damage to the building is $162,380.33.  This damage is covered by the Policy and should have

been paid by WW.  WW paid a total of $100,000 to Covington.  Covington is entitled to the balance

of the damages for WW's breach of contract in failing to pay the full ACV of the loss to the

Building.

> b.  <u>Business Personal Property</u>

Covington also seeks to recover for Active BPP damaged in the events, other than the

Stored Property discussed below.  Covington provided evidence of what Active BPP was lost, but

it provided no admissible evidence of the actual cash value of the Active BPP or the actual

replacement cost.

Covington made no attempt to establish the actual cash value or fair market value of the

Active BPP.  No evidence was presented as to the original purchase price for the property, the date

of purchase, the depreciation through use over time, the condition at the time of the events, and

the fair market value immediately prior to the loss.  Covington attempted to provide evidence of

replacement cost of the Active BPP.  However, Covington provided no evidence of the actual

replacement cost of the Active BPP and, without that, RCV is not recoverable.  Instead, Sunita

Patel sought to testify as to the value of items listed on a chart, which was allegedly prepared by

Mr. Singh, based on information he reportedly found from unspecified internet sources.  The Court

excluded the evidence because the document contained multiple levels of hearsay.  The document

itself was not Sunita Patel's work, but the work of Mr. Singh and the document did not satisfy any

exception to the hearsay rule.  Moreover, pursuant to Federal Rule of Evidence 805, if there is

hearsay within hearsay, each component of hearsay must satisfy a hearsay exception.  Fed. R. Evid.

805.  The information in the document came from the internet, yet another layer of hearsay that did not satisfy any exception to the hearsay rule.

While Covington has established what Active BPP was lost, it has not proved the amount it can recover.  The Court may not guess at the reasonable price for the damaged Active BPP. Failure to prove the specific amount owed under the Policy precludes a determination that WW breached its contract by failing to pay for loss to Active BPP and precludes an award of damages for Covington's lost or damaged Active BPP.

c.   <u>Stored Property</u>

Covington seeks to recover for the loss of the Stored Property purchased in anticipation of a refurbishment of the motel and kept in rooms on the first floor.  Sunita Patel testified to the number of each item stored and the cost to purchase each, contending this was the recoverable amount.

Generally, "[a]n opinion of value based on purchase price alone is insufficient and has no probative value."  <u>Messmore v. Roth</u>, 185 Ga. App. 862, 862 (1988).  Merely listing damaged items, along with a monetary figure estimating replacement cost based entirely upon the original purchase price, is not sufficient evidence to establish damages under the law, as the cost of property alone is insufficient proof of market value.  <u>Champion v. Dodson</u>, 263 Ga. App. 286, 288 (2003). If, however, the price is offered with other evidence of the date of purchase and the condition of the property immediately prior to its loss or destruction, the price of an item may be admitted.  <u>See id.</u>  "Ordinarily, a [fact finder] is authorized to make a finding as to market value based on the purchase price, the recentness of the purchase, the care given between the purchase and the loss, etc[.]"  <u>Id.</u> at 291.  "Where evidence shows that the tangible personal property . . . did not change in condition between the time of wholesale purchase and the loss, the [fact finder] may infer that

49

the fair market wholesale value immediately prior to the loss and the wholesale purchase price were the same, because a rebuttable presumption arises of continuing condition." Id. at 288; see also Cunningham v. Hodges, 150 Ga. App. 827 (1979) (directed verdict proper as to damages to furniture and household goods destroyed in a fire).  The nature of the property matters.  Immutable items such as furniture are different than items, such as pharmaceuticals and foodstuffs, with a finite shelf life that deteriorate in value or change in condition from the time of purchase.  See Champion, 263 Ga. App. at 290.

Covington provided evidence from which the Court can infer that the fair market value of the Stored Property continued unchanged from the price it paid for the items.  Given that the Stored Property was recently purchased and in new condition, the Court finds the cost of the Stored Property was equal to its fair market value.  The ACV of the Stored Property is $112,487.00.  The Stored Property was contained in 19 of the 24 rooms.  The Court allocates the value of the Stored Property evenly between the rooms, or $5,920.37 each.  Furniture was stored in Rooms 133 and 134 and the ACV of Stored Property allocable to these two rooms is $11,840.74.  This amount is covered by the Sewer Endorsement and has already been paid by WW.  Covington is therefore entitled to damages of $100,646.26 for WW's breach of contract in failing to pay the ACV of the loss of the remaining Stored Property.

d.  Income

Covington seeks lost business income.  Under the Policy, it can recover Net Income that would have been earned and continuing normal operating expenses incurred.  The purpose of business interruption insurance is to protect the prospective earnings of the insured business only to the extent of the amount the business would have earned had no interruption occurred.  Liberty Mut. Ins. Co. v. Sexton Foods Co., 42 Ark. App. 102, 106 (1993).  The insured may be entitled to

recover the actual loss of income, less any normal charges and expenses that do not continue during the interruption of business, incurred while the insured's business is suspended due to covered physical loss up to a defined "period of restoration" (i.e., the reasonable period within which the insured may repair and replace the damaged property with due diligence and dispatch).  See Ernest Martin, Jr., Recent Developments in Disaster Coverage: What to Look Out for in Today's Commercial Property Policies, 2011 WL 2532996, at *7 (June 2011).  "The measure of recovery should be the actual income lost, not simply the gross amount that the business would have received during the recovery period."  5 New Appleman on Insurance Law Library Edition § 46.08 (2021).

It is the policyholder's burden to prove the loss.  Compagnie Des Bauxites De Guinee v. Ins. Co. of N. Am., 721 F.2d 109, 116 (3d Cir. 1983); Dictiomatic, Inc. v. United States Fid. & Guar. Co., 958 F. Supp. 594, 605 (S.D. Fla. 1997) (the insured "has the burden of proving all the 'continuing normal operating expenses incurred', as well as its expected income during the period of restoration.").  The initial burden on the policyholder to establish the amount of a loss is a light one, and the policyholder will not be precluded from recovering simply because he or she cannot calculate the exact amount of loss.

> Recovery for lost profits does not require that the loss be susceptible of exact calculation.  However, the injured party must do more than show that they suffered some lost profits.  The amount of the loss must be shown by competent evidence with reasonable certainty. . . . A[t] a minimum, opinions or estimates of lost profits must be based on objective facts, figures, or data from which the amount of lost profits can be ascertained.

Holt Atherton Indus., Inc. v. Heine, 835 S.W.2d 80, 84 (Tex. 1992) (internal citations omitted); see also U.S. ex rel. Ragghianti Founds. III, LLC v. Peter R. Brown Constr., Inc., 49 F. Supp. 3d 1031, 1047 (M.D. Fla. 2014).  "Lost profits calculations must encompass both the anticipated

income from lost business activity, as well as the expenses that would have been attributable to that activity." In re Texans CUSO Ins. Grp., LLC, 426 B.R. 194, 211 (Bankr. N.D. Tex. 2010).

The insured must demonstrate the lost profit was a result of the covered loss.  For example, in S. Hotels Ltd. P'ship v. Lloyd's Underwriters at London Cos., 1996 WL 592732 (E.D. La. Oct. 11, 1996), a hotel sought lost hotel revenue following damage from a hurricane.  The court stated the insured was required to "show that it lost revenue as a result of damages caused by Hurricane Andrew."  Id. at *3.  The court observed that "[w]hile the hotel may have lost business" in the months after the hurricane, "there may have been other reasons for the poor occupancy rate, as there was in 1994, when the winter months had low occupancy, and in 1995, due to renovations which placed rooms out of service[.]"  Id.

"Continuing expenses," as referenced in the Policy, means fixed costs, that is costs that must be paid during the period of restoration even when a company is not operating at normal capacity.  Examples include "mortgage or rent payments; certain, but not necessarily all, salaries; advertising; insurance; and property taxes."  5 New Appleman on Insurance Law Library Edition § 46.08 (2021).  An insured may recover such expenses, even if not actually paid, if the policy provides.  See Di Leo v. United States Fid. & Guar. Co., 109 Ill. App. 2d 28, 41 (1969) (finding nothing required salaries actually be paid—only that they be normal charges and expenses necessary to adequate resumption of operations); Nat'l Union Fire Ins. Co. v. Scandia of Hialeah, 414 So. 2d 533, 535 (Fla. Dist. Ct. App. 1982) (that insured did not actually pay personnel during the business interruption did not mean item could not be considered for the purpose of determining the amount of recovery); but see Royal Indem. Co. v. Little Joe's Catfish Inn, Inc., 636 S.W.2d 530, 535 (Tex. App. 1982) (denying business loss expenses where salaries where never paid after fire and there was no evidence the insured made any payroll payments after the fire and stating,

"[i]t is our opinion that in order for there to be a liability for business interruption loss, the claimant must show an actual monetary loss."). Here, the Policy allows for recovery of expenses <u>incurred</u>. It does not require the expenses be paid.

The insured may be entitled to recover business income even if a business was operating at a loss at the time of the interruption. Cases have rejected the principle that "recovery is completely barred in the event that business is not operating at a profit[.]" <u>Koken v. Lexington Ins. Co.</u>, 2006 WL 5377234, at *8 (E.D. Pa. Jan. 30, 2006) (citing <u>Liberty Mut. Ins. Co. v. Sexton Foods Co., Inc.</u>, 854 S.W.2d 365, 367 (Ark. 1993)). "Business income" generally includes two components: (1) net income and (2) continuing normal operating expenses incurred. This language has been interpreted to mean business income is the "sum" of the net income and continuing operating expenses. <u>Santa Fe Surgery Ctr., LLC v. Sentinel Ins. Co., Ltd.</u>, 2020 WL 6018871, at *3 (M.D. Fla. Oct. 7, 2020). An insured can recover as long as the net loss that would have been incurred had there been no business interruption does not exceed the amount of normal operating expenses actually incurred. <u>Cont'l Ins. Co. v. DNE Corp.</u>, 834 S.W.2d 930, 934–35 (Tenn. 1992); <u>see also</u> <u>Liberty Mut. Ins. Co. v. Sexton Foods Co.</u>, 42 Ark. App. 102, 106-07 (1993) ("We reject, however, Liberty's contention that recovery is completely barred in the event that a business is not operating at a profit."). "This is in keeping with the general principle that the insurance should do for the insured what the business itself would have done had no interruption occurred." 5 New Appleman on Insurance Law Library Edition § 46.08 (2021).

With regard to calculating "net income," the Policy refers to "net income" as "Net Profit or Loss before income taxes" that "would have been earned or incurred if no direct physical loss or physical damage had occurred." The Policy does not specifically define "net income" or otherwise provide a formula for how it is calculated, other than to specify it is before taxes. "The

absence of a formula, however, does not render the Policy ambiguous." Santa Fe Surgery Ctr.,
LLC v. Sentinel Ins. Co., Ltd., 2020 WL 6018871, at *3 (M.D. Fla. Oct. 7, 2020).  The plain
meaning of "net income" is "sales minus cost of goods sold, selling, general and administrative
expenses, operating expenses, depreciation, interest, taxes, and other expenses."  Id. at *3 n.2
(citing Net Income, https://www.investopedia.com/terms/n/netincome.asp).  Courts have adopted
this plain meaning and have concluded that expenses such as cost of goods sold, general and
administrative expenses, operating expenses, depreciation, interest, taxes, and other expenses
should be subtracted from total revenue to determine "net income" when calculating "business
income."  See id. at *3.  Failing to account for such expenses when calculating net income will
inflate the actual loss of business income claimed.  Id. at *5.

The Court finds that, based on the evidence, the actual monthly lost profit is $873.32 per
month. This takes into account that 19 rooms were not available for rent.  Moreover, the period of
restoration is a maximum of six weeks.   Therefore, Covington's maximum lost income is
$1,309.98.  Because the Court has determined Rooms 133 and 134 (damaged by both the water
pipe break and the sewer drain backup) were being used for the Stored Property and not available
for rent, the entire lost income is attributable to rooms damaged by the water pipe break.

The Policy also allows the insured to recover its continuing normal operating expenses
incurred.  Covington's monthly mortgage payment was $9,000; its monthly prorated property tax
is $2,144.44; its monthly worker's compensation insurance is $102.75; its monthly general liability
insurance payment is $1,040.42; and its monthly utilities are $2,497.87.   These continuing
operating expenses are recoverable, but only for a six-week period (1.5 months), for a total of
$22,178.22 or $426.50 per room (total divided by 52 rooms).  So, $853 of the continuing expenses
is allocable to Rooms 133 and 134 and covered by the Sewer Endorsement, and the balance,

$21,325.22, is allocable to the water claim.  The total business income loss (lost income and continuing expenses) covered by the water claim is therefore $22,635.20.

To summarize, the damages proven by Covington and the Court's allocation between the sewer and water claims is as follows:

| | Sewer | Water |
|---|---|---|
| Building | $34,736.03 | $162,380.33 |
| Active BPP | $0 | $0 |
| Stored Property | $11,840.74 | $100,646.26 |
| Business Income | $853 | $22,635.20 |
| Total | $47,429.77 | $285,661.79 |
| Paid | $47,429.77 | $52,570.23 (balance of $100,000 paid) |
| **Due** | **$0** | **$233,091.56** |

WW breached its contract by failing to pay $233,091.56 due to Covington under the Policy for which Covington is entitled to recover.

## **CONCLUSION**

The ACC clause does not apply to this case as a matter of contract construction and based on the facts of this case.  As a matter of contract construction, the Court concludes the ACC does not apply to eliminate coverage for damage caused by the water pipe break and sewer back up, even if such damage is concurrent and inseparable, because Covington purchased the Sewer Endorsement at issue here which made the sewer pipe backup a covered cause of loss.  But even if the ACC clause were applicable, WW failed to carry its burden of showing the damage caused by the water pipe break was also caused by or contributed to by a sewer drain backup, except with respect to Rooms 133 and 134 and the administration building.  The Court has allocated the damages between those areas where the sewer drain backup contributed to the damage and those where it does not.  The total damages associated with the sewer drain back up is $47,429.77, well

within the limits of liability of the Sewer Endorsement.  The balance of the damage was caused by the water pipe break only.  WW failed to pay those damages in full and is liable to Covington in the amount of $233,091.56.

**IT IS HEREBY ORDERED** that Covington recover a judgement against WW in the amount of **$233,091.56**.

### ### END OF ORDER ###

## DISTRIBUTION LIST

Edward F. Danowitz
Danowitz Legal, P.C.
PO Box 681506
Building 24, Suite 350
1640 Powers Ferry Road
Marietta, GA 30068

Salvatore J. Serio
Serio Law, Inc.
1302 Milstead Avenue
Conyers, GA 30312

Lewis Andrew Watson
Butler Weihmuller Katz Craig, LLP
11605 N. Community House Rd, Ste 150
Charlotte, NC 28277